# COHEN *v.* CALIFORNIA

No. 299. Argued February 22, 1971—Decided June 7, 1971

HARLAN, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, STEWART, and MARSHALL, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BURGER, C. J., and BLACK, J., joined, and in which WHITE, J., joined in part, *post,* p. 27.

*Melville B. Nimmer* argued the cause for appellant. With him on the brief was *Laurence R. Sperber.*

*Michael T. Sauer* argued the cause for appellee. With him on the brief was *Roger Arnebergh.*

*Anthony G. Amsterdam* filed a brief for the American Civil Liberties Union of Northern California as *amicus curiae* urging reversal.

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case may seem at first blush too inconsequential to find its way into our books, but the issue it presents is of no small constitutional significance.

16

Appellant Paul Robert Cohen was convicted in the Los Angeles Municipal Court of violating that part of California Penal Code § 415 which prohibits "maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person . . . by . . . offensive conduct . . . ." [1] He was given 30 days' imprisonment. The facts upon which his conviction rests are detailed in the opinion of the Court of Appeal of California, Second Appellate District, as follows:

"On April 26, 1968, the defendant was observed in the Los Angeles County Courthouse in the corridor outside of division 20 of the municipal court wearing a jacket bearing the words 'Fuck the Draft' which were plainly visible. There were women and children present in the corridor. The defendant was arrested. The defendant testified that he wore the jacket knowing that the words were on the jacket as a means of informing the public of the depth of his feelings against the Vietnam War and the draft.

"The defendant did not engage in, nor threaten to engage in, nor did anyone as the result of his conduct

---

[1] The statute provides in full:

"Every person who maliciously and willfully disturbs the peace or quiet of any neighborhood or person, by loud or unusual noise, or by tumultuous or offensive conduct, or threatening, traducing, quarreling, challenging to fight, or fighting, or who, on the public streets of any unincorporated town, or upon the public highways in such unincorporated town, run any horse race, either for a wager or for amusement, or fire any gun or pistol in such unincorporated town, or use any vulgar, profane, or indecent language within the presence or hearing of women or children, in a loud and boisterous manner, is guilty of a misdemeanor, and upon conviction by any Court of competent jurisdiction shall be punished by fine not exceeding two hundred dollars, or by imprisonment in the County Jail for not more than ninety days, or by both fine and imprisonment, or either, at the discretion of the Court."

in fact commit or threaten to commit any act of violence. The defendant did not make any loud or unusual noise, nor was there any evidence that he uttered any sound prior to his arrest." 1 Cal. App. 3d 94, 97–98, 81 Cal. Rptr. 503, 505 (1969).

In affirming the conviction the Court of Appeal held that "offensive conduct" means "behavior which has a tendency to provoke *others* to acts of violence or to in turn disturb the peace," and that the State had proved this element because, on the facts of this case, "[i]t was certainly reasonably foreseeable that such conduct might cause others to rise up to commit a violent act against the person of the defendant or attempt to forceably remove his jacket." 1 Cal. App. 3d, at 99–100, 81 Cal. Rptr., at 506. The California Supreme Court declined review by a divided vote.[2] We brought the case here, postponing the consideration of the question of our jurisdiction over this appeal to a hearing of the case on the merits. 399 U. S. 904. We now reverse.

The question of our jurisdiction need not detain us long. Throughout the proceedings below, Cohen con-

---

[2] The suggestion has been made that, in light of the supervening opinion of the California Supreme Court in *In re Bushman,* 1 Cal. 3d 767, 463 P. 2d 727 (1970), it is "not at all certain that the California Court of Appeal's construction of § 415 is now the authoritative California construction." *Post,* at 27 (BLACKMUN, J., dissenting). In the course of the *Bushman* opinion, Chief Justice Traynor stated:

"[One] may . . . be guilty of disturbing the peace through 'offensive' conduct [within the meaning of § 415] if by his actions he wilfully and maliciously incites others to violence or engages in conduct likely to incite others to violence. (*People* v. *Cohen* (1969) 1 Cal. App. 3d 94, 101, [81 Cal. Rptr. 503].)" 1 Cal. 3d, at 773, 463 P. 2d, at 730.

We perceive no difference of substance between the *Bushman* construction and that of the Court of Appeal, particularly in light of the *Bushman* court's approving citation of *Cohen.*

18

sistently claimed that, as construed to apply to the facts of this case, the statute infringed his rights to freedom of expression guaranteed by the First and Fourteenth Amendments of the Federal Constitution. That contention has been rejected by the highest California state court in which review could be had. Accordingly, we are fully satisfied that Cohen has properly invoked our jurisdiction by this appeal. 28 U. S. C. § 1257 (2); *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 (1921).

## I

In order to lay hands on the precise issue which this case involves, it is useful first to canvass various matters which this record does *not* present.

The conviction quite clearly rests upon the asserted offensiveness of the *words* Cohen used to convey his message to the public. The only "conduct" which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon "speech," cf. *Stromberg* v. *California,* 283 U. S. 359 (1931), not upon any separately identifiable conduct which allegedly was intended by Cohen to be perceived by others as expressive of particular views but which, on its face, does not necessarily convey any message and hence arguably could be regulated without effectively repressing Cohen's ability to express himself. Cf. *United States* v. *O'Brien,* 391 U. S. 367 (1968). Further, the State certainly lacks power to punish Cohen for the underlying content of the message the inscription conveyed. At least so long as there is no showing of an intent to incite disobedience to or disruption of the draft, Cohen could not, consistently with the First and Fourteenth Amendments, be punished for asserting the evident position on the inutility or immorality of the draft his jacket reflected. *Yates* v. *United States,* 354 U. S. 298 (1957).

Appellant's conviction, then, rests -squarely upon his exercise of the "freedom of speech" protected from arbitrary governmental interference by the Constitution and can be justified, if at all, only as a valid regulation of the manner in which he exercised that freedom, not as a permissible prohibition on the substantive message it conveys. This does not end the inquiry, of course, for the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he chooses. In this vein, too, however, we think it important to note that several issues typically associated with such problems are not presented here.

In the first place, Cohen was tried under a statute applicable throughout the entire State. Any attempt to support this conviction on the ground that the statute seeks to preserve an appropriately decorous atmosphere in the courthouse where Cohen was arrested must fail in the absence of any language in the statute that would have put appellant on notice that certain kinds of otherwise permissible speech or conduct would nevertheless, under California law, not be tolerated in certain places. See *Edwards* v. *South Carolina,* 372 U. S. 229, 236–237, and n. 11 (1963). Cf. *Adderley* v. *Florida,* 385 U. S. 39 (1966). No fair reading of the phrase "offensive conduct" can be said sufficiently to inform the ordinary person that distinctions between certain locations are thereby created.[3]

In the second place, as it comes to us, this case cannot be said to fall within those relatively few categories of

---

[3] It is illuminating to note what transpired when Cohen entered a courtroom in the building. He removed his jacket and stood with it folded over his arm. Meanwhile, a policeman sent the presiding judge a note suggesting that Cohen be held in contempt of court. The judge declined to do so and Cohen was arrested by the officer only after he emerged from the courtroom. App. 18–19.

20

instances where prior decisions have established the power of government to deal more comprehensively with certain forms of individual expression simply upon a showing that such a form was employed. This is not, for example, an obscenity case. Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic. *Roth* v. *United States,* 354 U. S. 476 (1957). It cannot plausibly be maintained that this vulgar allusion to the Selective Service System would conjure up such psychic stimulation in anyone likely to be confronted with Cohen's crudely defaced jacket.

This Court has also held that the States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called "fighting words," those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). While the four-letter word displayed by Cohen in relation to the draft is not uncommonly employed in a personally provocative fashion, in this instance it was clearly not "directed to the person of the hearer." *Cantwell* v. *Connecticut,* 310 U. S. 296, 309 (1940). No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult. Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction. Cf. *Feiner* v. *New York,* 340 U. S. 315 (1951); *Terminiello* v. *Chicago,* 337 U. S. 1 (1949). There is, as noted above, no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result.

Finally, in arguments before this Court much has been made of the claim that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, *e. g.*, *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415 (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, *e. g.*, *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970), we have at the same time consistently stressed that "we are often 'captives' outside the sanctuary of the home and subject to objectionable speech." *Id.*, at 738. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

In this regard, persons confronted with Cohen's jacket were in a quite different posture than, say, those subjected to the raucous emissions of sound trucks blaring outside their residences. Those in the Los Angeles courthouse could effectively avoid further bombardment of their sensibilities simply by averting their eyes. And, while it may be that one has a more substantial claim to a recognizable privacy interest when walking through a courthouse corridor than, for example, strolling through Central Park, surely it is nothing like the interest in

being free from unwanted expression in the confines of one's own home. *Cf. Keefe, supra.* Given the subtlety and complexity of the factors involved, if Cohen's "speech" was otherwise entitled to constitutional protection, we do not think the fact that some unwilling "listeners" in a public building may have been briefly exposed to it can serve to justify this breach of the peace conviction where, as here, there was no evidence that persons powerless to avoid appellant's conduct did in fact object to it, and where that portion of the statute upon which Cohen's conviction rests evinces no concern, either on its face or as construed by the California courts, with the special plight of the captive auditor, but, instead, indiscriminately sweeps within its prohibitions all "offensive conduct" that disturbs "any neighborhood or person." *Cf. Edwards v. South Carolina, supra.*[4]

## II

Against this background, the issue flushed by this case stands out in bold relief. It is whether California can excise, as "offensive conduct," one particular scurrilous epithet from the public discourse, either upon the theory of the court below that its use is inherently likely to cause violent reaction or upon a more general assertion that the States, acting as guardians of public morality,

---

[4] In fact, other portions of the same statute do make some such distinctions. For example, the statute also prohibits disturbing "the peace or quiet . . . by loud or unusual noise" and using "vulgar, profane, or indecent language within the presence or hearing of women or children, in a loud and boisterous manner." See n. 1, *supra.* This second-quoted provision in particular serves to put the actor on much fairer notice as to what is prohibited. It also buttresses our view that the "offensive conduct" portion, as construed and applied in this case, cannot legitimately be justified in this Court as designed or intended to make fine distinctions between differently situated recipients.

may properly remove this offensive word from the public vocabulary.

The rationale of the California court is plainly untenable. At most it reflects an "undifferentiated fear or apprehension of disturbance [which] is .not enough to overcome the right to freedom of expression." *Tinker* v. *Des Moines Indep. Community School Dist.*, 393 U. S. 503, 508 (1969). We have been shown no evidence that substantial. numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with execrations like that uttered by Cohen. There may be some persons about with such lawless and violent proclivities, but that is an insufficient base upon which to erect, consistently with constitutional values, a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression. The argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless, the States may more appropriately effectuate that censorship themselves. Cf. *Ashton* v. *Kentucky*, 384 U. S. 195, 200 (1966); *Cox* v. *Louisiana*, 379 U. S. 536, 550–551 (1965).

Admittedly, it is not so obvious that the First and Fourteenth Amendments must be.taken to disable the States from punishing public utterance of this unseemly expletive in order to maintain what they regard as a suitable level of discourse within the body politic.[5] We

---

[5] The *amicus* urges, with some force, that this issue is not properly before us since the statute, as construed, punishes only conduct that might cause others to react violently. However, because the opinion below appears to erect a virtually irrebuttable presumption that use of this word will produce such results, the statute as thus construed appears to impose, in effect, a flat ban on the public utterance .of this word. With the case in this posture, it does not seem inappro-

think, however, that examination and reflection will reveal the shortcomings of a contrary viewpoint.

At the outset, we cannot overemphasize that, in our judgment, most situations where the State has a justifiable interest in regulating speech will fall within one or more of the various established exceptions, discussed above but not applicable here, to the usual rule that governmental bodies may not prescribe the form or content of individual expression. Equally important to our conclusion is the constitutional backdrop against which our decision must be made. The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. See *Whitney* v. *California,* 274 U. S. 357, 375–377 (1927) (Brandeis, J., concurring).

To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and

---

priate to inquire whether any other rationale might properly support this result. While we think it clear, for the reasons expressed above, that no statute which merely proscribes "offensive conduct" and has been construed as broadly as this one was below can subsequently be justified in this Court as discriminating between conduct that occurs in different places or that offends only certain persons, it is not so unreasonable to seek to justify its full broad sweep on an alternate rationale such as this. Because it is not so patently clear that acceptance of the justification presently under consideration would render the statute overbroad or unconstitutionally vague, and because the answer to appellee's argument seems quite clear, we do not pass on the contention that this claim is not presented on this record.

. even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated. That is why "[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons," *Winters* v. *New York*, 333 U. S. 507, 528 (1948) (Frankfurter, J., dissenting), and why "so long as the means are peaceful, the communication need not meet standards of acceptability," *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 419 (1971).

Against this perception of the constitutional policies involved, we discern certain more particularized considerations that peculiarly call for reversal of this conviction. First, the principle contended for by the State seems inherently boundless. How is one to distinguish this from any other offensive word? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.

Additionally, we cannot overlook the fact, because it

is well illustrated by the episode involved here, that much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated. Indeed, as Mr. Justice Frankfurter has said, "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner* v. *United States*, 322 U. S. 665, 673–674 (1944).

Finally, and in the same vein, we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from running the risk of opening the door to such grave results.

It is, in sum, our judgment that, absent a more particularized and compelling reason for its actions, the State may not, consistently with the First and Fourteenth Amendments, make the simple public display here involved of this single four-letter expletive a criminal offense. Because that is the only arguably sustainable rationale for the conviction here at issue, the judgment below must be

*Reversed.*

Mr. Justice Blackmun, with whom The Chief Justice and Mr. Justice Black join.

I dissent, and I do so for two reasons:

1. Cohen's absurd and immature antic, in my view, was mainly conduct and little speech. See *Street* v. *New York,* 394 U. S. 576 (1969); *Cox* v. *Louisiana,* 379 U. S. 536, 555 (1965); *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, 502 (1949). The California Court of Appeal appears so to have described it, 1 Cal. App. 3d 94, 100, 81 Cal. Rptr. 503, 507, and I cannot characterize it otherwise. Further, the case appears to me to be well within the sphere of *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942), where Mr. Justice Murphy, a known champion of First Amendment freedoms, wrote for a unanimous bench. As a consequence, this Court's agonizing over First Amendment values seems misplaced and unnecessary.

2. I am not at all certain that the California Court of Appeal's construction of § 415 is now the authoritative California construction. The Court of Appeal filed its opinion on October 22, 1969. The Supreme Court of California declined review by a four-to-three vote on December 17. See 1 Cal. App. 3d, at 104. A month later, on January 27, 1970, the State Supreme Court in another case construed § 415, evidently for the first time. *In re Bushman,* 1 Cal. 3d 767, 463 P. 2d 727. Chief Justice Traynor, who was among the dissenters to his court's refusal to take Cohen's case, wrote the majority opinion. He held that § 415 ' is not unconstitutionally vague and overbroad" and further said:

> "[T]hat part of Penal Code section 415 in question here makes punishable only wilful and malicious conduct that is violent and endangers public safety and order or that creates a clear and present .danger that others will engage in violence of that nature.

". . . [It] does not make criminal any nonviolent act unless the act incites or threatens to incite others to violence . . . ." 1 Cal. 3d, at 773–774, 463 P. 2d, at 731.

*Cohen* was cited in *Bushman,* 1 Cal. 3d, at 773, 463 P. 2d, at 730, but I am not convinced that its description there and *Cohen* itself are completely consistent with the "clear and present danger" standard enunciated in *Bushman.* Inasmuch as this Court does not dismiss this case, it ought to be remanded to the California Court of Appeal for reconsideration in the light of the subsequently rendered decision by the State's highest tribunal in *Bushman.*

MR. JUSTICE WHITE concurs in Paragraph 2 of MR. JUSTICE BLACKMUN's dissenting opinion.