[Crim. No. 21945. Dec. 7, 1981.]

THE PEOPLE, Plaintiff and Appellant, v.
SHAHRAM MIRMIRANI, Defendant and Respondent.

COUNSEL

John K. Van de Kamp, District Attorney, Donald J. Kaplan, Harry B. Sondheim and Roderick W. Leonard, Deputy District Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Dennis A. Fischer, George H. Meyerhoff and Melissa Hill, Deputy Public Defenders, for Defendant and Respondent.

Quin Denvir, State Public Defender, and John Denvir as Amici Curiae on behalf of Defendant and Respondent.

OPINION

BIRD, C. J.—Are Penal Code sections 422 and 422.5,[1] which make it a felony to threaten to commit certain crimes "in order to achieve social or political goals," unconstitutionally vague?

I.

On May 1, 1979, Shahram Mirmirani walked into the Van Nuys police station in Los Angeles and spoke with Police Officer Charles Meter. In testimony at the preliminary examination, Meter described their conversation as follows.[2] Mirmirani asked Meter for the names of the two police officers who had arrested him five days earlier for possession of a small marijuana plant in his apartment.[3] Meter told

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

[2] Mirmirani did not testify at the preliminary hearing. In argument, his counsel indicated that Mirmirani's recollection of the conversation was very different and that Mirmirani would assert that Meter misunderstood him because of his heavy accent.

[3] A *charge of possession of marijuana* was filed against Mirmirani but later dismissed.

Mirmirani that the officers were Billy Kendig and William McAllister. Mirmirani said he wanted to sue them. Clenching his hand into a fist, he gestured toward his chin as if to punch himself. He said that the officers had done that to him so he wanted to do the same to them. Meter asked if he meant "an eye for an eye and a tooth for a tooth," and Mirmirani replied "yes."

Mirmirani went on to say that he did not want money from the officers, but wanted the court to take a child away from each of them. When Meter said the court would not do that, Mirmirani said he would do it himself. He explained that his wife had been pregnant when the officers arrested him, and had then gone into labor and delivered a baby that lived only four or five minutes. He said something about the "Islamic Code"[4] and indicated that after he had taken the life of a child of each of the officers he and his wife would be out of the country within three days. Mirmirani spoke with Meter for approximately one-half hour. They shook hands as Mirmirani left.

Meter testified that he was very disturbed by Mirmirani, in part because Mirmirani appeared very calm, rational and precise. Meter called Kendig and McAllister to the station from their patrol and told them of the conversation. He also informed his superiors at the police station.

McAllister and Kendig both testified that they were concerned by Meter's description of Mirmirani's conduct. They indicated that they were accustomed to threats against their own safety, but their families had never been threatened. They continued with their patrol duties, but returned to the station twice to consult with Meter about precautions to ensure the safety of their families. After the second discussion, they received permission to return home, because they felt they were too concerned to concentrate on their work. Meter suggested that they contact the police psychologist, but neither of them did so.

Meter and his superiors arranged increased police patrols in the neighborhoods in which McAllister and Kendig lived. These patrols continued for at least three days. They also contacted the police department intelligence division, which dealt with threats on police officers,

---

[4]Meter was unsure of the exact phrase used by Mirmirani. Meter testified, "At that time the defendant told me that according to the Islamic—he didn't use the word 'faith,' but a word similar to it—that by the Islamic code, he was going to take the life of the child of each officer."

and the public disorder intelligence division, which dealt with information relating to "political-type" groups. Neither division had any information about Mirmirani.

The following day, May 2, 1979, Meter accompanied police department investigators to Mirmirani's apartment. The door was opened by a pregnant woman who said she was Mirmirani's wife. When Meter asked Mirmirani why he had said his baby had died, Mirmirani muttered and appeared confused.

Kendig testified that his fears continued for up to two weeks after the initial incident. McAllister testified that his fear eased after he found that Mirmirani's wife was still pregnant. Both officers warned their wives and neighbors about the threats. They changed their schedules for some time after the incident so they could be at home with their families in the evenings.

As a result of these events, Mirmirani was arrested and charged with two violations of section 422, subdivision (a), a felony. At his preliminary examination on the charges, he argued that there was no evidence that his threats had been made in order to achieve a social or political goal as required by the statute. The magistrate replied, "[Y]ou can call a personal vendetta a social goal, perhaps." Although "[i]t is very difficult to define just what the legislature had in mind," the magistrate held that Mirmirani's threat was both social and political and therefore fell within the purview of the statute. The magistrate felt that the threats were apparently designed to "strik[e] fear at the heart of those who have arrested him in the ordinary course of duty. . . . There is another side of politics which is our way of life and the way our government is constituted and its orderly processes, where these things are not to be tolerated."

Mirmirani was held to answer. An information was filed against him on July 29, 1979. A motion to set aside the information pursuant to section 995 was filed as well as a demurrer to the information. These motions were based on the contention that there was no evidence that Mirmirani's threats were politically or socially motivated and that sections 422 and 422.5 were unconstitutionally vague and overbroad.

During the argument on Mirmirani's motions, the district attorney conceded that the statute was vague. "I don't know what the words, 'to

achieve social or political goals,' mean[].... I don't think your Honor knows what the words mean .... It's my position that the words 'to achieve social or political goals' are the words that create any semblance of unconstitutionality because they are vague, and simply because if the defendant doesn't know what it means and the Court doesn't know what it means, we don't know whether we are talking about a personal goal or a political goal or a general goal. Those words are vague." The district attorney argued that those words should be stricken from the statute.

The trial court overruled Mirmirani's demurrer, but granted the motion to set aside the information under section 995. This ruling was based on the fact there was no evidence to support a finding that Mirmirani made threats to achieve social or political goals. The district attorney appealed from the granting of the section 995 motion. Mirmirani challenged the constitutionality of sections 422 and 422.5.

## II.

Section 422 makes it a felony to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with *intent to terrorize another or with reckless disregard of the risk of terrorizing another*," if such threats cause another person "reasonably to be in sustained fear for his or her[] or their immediate family's safety."[5] (Italics added.) To "terrorize" is defined by section 422.5 as "creat[ing] a climate of fear and intimidation by means of threats or violent action causing sustained fear for personal safety *in order to achieve social or political goals*." (Italics added.)

---

[5]Sections 422 and 422.5 read as follows: "§ 422. Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with intent to terrorize another or with reckless disregard of the risk of terrorizing another, and who thereby either:

"(a) Causes another person reasonably to be in sustained fear for his or hers or their immediate family's safety;

"(b) Causes the evacuation of a building, place of assembly, or facility used in public transportation;

"(c) Interferes with essential public services; or

"(d) Otherwise causes serious disruption of public activities, is guilty of a felony and shall be punished by imprisonment in the state prison."

"§ 422.5. As used in this title, 'terrorize' means to create a climate of fear and intimidation by means of threats or violent action causing sustained fear for personal safety in order to achieve social or political goals."

■ Read together, the two statutes penalize only threats made with intent to achieve "social or political goals."[6] Respondent Mirmirani contends that the phrase "social or political goals" is unconstitutionally vague. Further, he argues that the offending phrase cannot be severed from the rest of sections 422 and 422.5. Therefore, both sections must be declared unconstitutional in their entirety.

■ "The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law. 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids ... "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."' (*Lanzetta* v. *New Jersey* [(1939)] 306 U.S. 451, 453 [59 S.Ct. 618, 83 L.Ed. 888], [quoting] *Connally* v. *General Const. Co.* [(1926)] 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322].) Such also is the law of the State of California. (*People* v. *McCaughan* [(1957)] 49 Cal.2d 409, 414 [317 P.2d 974].)" (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].)

■ If a law is vague, several serious constitutional problems emerge. First, insufficient notice is provided to the citizenry as to what is prohibited. "Vague laws may trap the innocent by not providing fair warning." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294].) Second, vague laws do not provide explicit standards to those who must enforce them. "[V]ague statutory language also creates the danger that police, prosecutors, judges and juries will lack sufficient standards to reach their decisions, thus opening the door to arbitrary or discriminatory enforcement of the law." (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 252 [158 Cal.Rptr. 330, 599 P.2d 636]. See also *In re Newbern, supra*, 53 Cal.2d 786, 796.)

---

[6]Appellant contends that the definition of "terrorize" in section 422.5 applies only to the "intent to terrorize" clause in section 422, not to the "reckless disregard of the risk of terrorizing" provision. Relying on this distinction, appellant argues that the intent to "achieve social or political goals" limitation applies only to intentional threats, while all reckless threats are included within the statute, no matter what their goals.

This contention is without merit. It is well settled that a word or phrase should be given the same scope or meaning when it appears in separate parts of a statute. (*Pitte* v. *Shipley* (1873) 46 Cal. 154, 160; *Corey* v. *Knight* (1957) 150 Cal.App.2d 671, 680 [310 P.2d 673].) The Legislature clearly intended the definition of "terrorize" to apply to "terrorizing" as well.

Finally, when a criminal statute impacts on First Amendment rights, greater precision should be required to survive a void-for-vagueness challenge.[7] "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man [or woman] may the less be required to act at his [or her] peril here, because the free dissemination of ideas may be the loser." (*Smith v. California* (1959) 361 U.S. 147, 151 [4 L.Ed.2d 205, 210, 80 S.Ct. 215].)

The crime defined by sections 422 and 422.5 can consist of pure speech. The crime can be committed by words alone, without action or an intent to act. Therefore, the strict standards required by the First Amendment must be applied in analyzing respondent's vagueness challenge. "[A] statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." (*Watts v. United States, supra*, 394 U.S. 705, 707 [22 L.Ed.2d 664, 667].)

To evaluate respondent's claim of vagueness, this court will "look first to the language of the statute, then to its legislative history, and finally to California decisions construing the statutory language.

---

[7]Appellant argues that this statute does not impact on First Amendment rights because "threats" are not protected by the First Amendment. While it may be true that the Legislature can constitutionally penalize certain kinds of threats, such a statute must be narrowly interpreted to avoid penalizing protected speech. (*Watts v. United States* (1969) 394 U.S. 705, 707-708 [22 L.Ed.2d 664, 667, 89 S.Ct. 1399]; *United States v. Kelner* (2d Cir. 1976) 534 F.2d 1020, 1024-1027.)

This stringent requirement of precision in drafting statutes restricting speech reflects the treasured role free speech plays in our society. "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours." (*Cohen v. California* (1971) 403 U.S. 15, 24 [29 L.Ed.2d 284, 293, 91 S.Ct. 1780].) "[I]t is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes." (*Terminiello v. Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894].)

Those who founded our country recognized the value of unfettered speech when they included protection of speech, "the Constitution's most majestic guarantee" (Tribe, American Constitutional Law (1978) § 12-1, p. 576), as one of the first amendments to our Constitution. "They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth .... Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." (*Whitney v. California* (1927) 274 U.S. 357, 375-376 [71 L.Ed. 1095, 1105-1106, 47 S.Ct. 641] (conc. opn. of Brandeis, J.).)

[Citation.]" (*Pryor* v. *Municipal Court, supra*, 25 Cal.3d 238, 246.) The meaning of the language of the statute can appear either on the face of the statute or from any "established technical or common law meaning." (*In re Newbern, supra*, 53 Cal.2d 786, 792.)

■ The language contained in this statute, "social or political goals," has no established legal meaning. "Social" is defined as of or relating to "human society," "the interaction of the individual and the group," or the "welfare of human beings as members of society." (Webster's New Internat. Dict. (3d ed. 1961) p. 2161.) "Political" is defined as of or relating to "government," "the conduct of governmental affairs," or "politics." (*Id.*, at p. 1755.) Politics is "the art or science of government," "the regulation and control of men living in society," and the "total complex of interacting and [usually] conflicting relations between men living in society." (*Ibid.*)

These definitions do not provide clear lines by which citizens, law enforcement officials, judges and juries can understand what is prohibited and what is not.

The main problem with the statute is that it is all-inclusive. It is virtually impossible to determine what conduct by an individual in a democratic society could not in some way be construed as an attempt to achieve a "social" or "political" goal. At first glance, it might be argued that one who threatened another after a barroom brawl would not be included within the scope of the statute. However, if the brawl started because of a racial epithet and one of the participants hoped to deter members of a certain racial group from coming to that bar, would such threats be made to achieve a goal related to "human society" or to the "conflicting relationships" among men and women in society? Clearly the statute provides no guidance to the police, prosecutor, judge or jury who must decide whether the conduct was motivated by the desire to achieve a social or political goal.

Despite the apparent intent to limit the scope of the statute to threats aimed at achieving "social or political goals," those words in fact provide no limitation at all. They are all-encompassing. Virtually any threat could be construed as an attempt to achieve a goal related to human society, human interactions, or governmental affairs. As a result, the statute leaves to the prosecution, the judge and the jury the impossible task of determining what threats were intended to be included within its scope. Such unguided discretion is an impermissible violation

of constitutional due process requirements. "Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgressions. [Citations.]" (*Thornhill v. Alabama* (1940) 310 U.S. 88, 98 [84 L.Ed. 1093, 1100, 60 S.Ct. 736].)

The problem in applying this statute was underscored in the trial court. At the preliminary hearing, the defense counsel labeled Mirmirani's actions no more than a "personal vendetta." The magistrate replied, "you can call a personal vendetta a social goal, perhaps," and added that "politics" includes "our way of life .... " As interpreted by the magistrate, "social" meant any attempt to revenge a wrong committed by another person and "political" included any threat against the police.

The district attorney who argued against respondent's section 995 motion conceded that the phrase "social or political goals" was unconstitutionally vague. The only recourse was to strike it from the statute.

The superior court judge who ruled on the motion to dismiss assumed that a personal goal would not bring a threat within the statute. He granted the section 995 motion, although he expressed some doubts about the possibility that any threat that impacted on the criminal justice system could fall within the purview of the law.[8]

Legislative history provides no assistance in determining a more precise definition of "social" or "political." Sections 422 and 422.5 were added to the Penal Code in 1977. (Stats. 1977, ch. 1146, § 1, pp. 3684-3685.) The intent-to-terrorize language was added by amendment in the Senate. (Sen. Amend. to Sen. Bill No. 923 (1977-1978 Reg. Sess.) June 1, 1977.) Later, the bill was amended by the Assembly to define "terrorize," including the requirement of an intent to achieve social or political goals. (Assem. Amend. to Sen. Bill No. 923 (1977-1978 Reg. Sess.) Aug. 16, 1977.)

---

[8]The judge posed this hypothetical to the district attorney: "Suppose I see you out in the hall this afternoon and I go, 'I didn't like your argument up in my court this afternoon. I am either going to punch you out today or I am going to get you as quickly as I can at the first moment I can do you in.... ' I gave you a climate of fear ... you thought I was going to achieve a social goal of having a deputy district attorney come up and not argue in a frivolous fashion. Am I a terrorist? I sure fit the definition of that section under the outline I just gave you."

The statutes were supported by Pacific Gas and Electric Company and by some law enforcement agencies. (*Review of Selected 1977 California Legislation* (1978) 9 Pacific L.J. 423.) The statutes apparently were inspired in part by attacks on California utility installations. (*Id.*, at p. 424.) Nothing in this sketchy legislative history indicates what threats the Legislature intended to penalize when it adopted the language "social or political goals." Further, there are no California cases interpreting this law or the phrase "social or political goals."

Respondent's own conduct is a good example of the vagueness of the line drawn by the Legislature. He allegedly threatened to take some action in order to obtain revenge. Can revenge ever be considered a social goal? On the one hand, it certainly relates to "human society" and to interactions among the citizenry. On the other hand, respondent's concern was purely personal. He acted on his own to achieve satisfaction for himself alone. Since the statute is so vague, these threats arguably could be included within its scope.

Similarly, respondent's attempt at self-help in response to what he considered to be illegitimate police activities arguably reflected a political goal: to obtain revenge without recourse to the accepted political processes of our system of government. Nonetheless, respondent was not connected with any political group and espoused no political beliefs. Was this a "political" threat under the statute? Nothing in the language of the statute, the legislative history or the case law furnishes an answer to this question.

Appellant argues that the statute could be saved by narrowly construing "social" and "political." Social would be defined as relating to the welfare of human beings as members of a society. It would include only goals that impacted on identifiable groups within society. "Political" would be limited to acts relating to government or governmental affairs. Unfortunately, this interpretation does not eliminate the statute's vagueness.

What type of group would trigger the definition of "social"? Is an intent to further one's personal interest outside of the statute, but an intent to help oneself and one's family within it? Similarly, a group of friends could be an identifiable group. Any goal that concerned more than one person might fall within this definition of a "social" goal. Further, an examination into the membership of a group a defendant

intended to benefit would raise additional First Amendment problems because of its chilling effect on freedom of association.

Narrowing the construction of "political goals" to government or governmental affairs presents the same problem. Would the statute be triggered by *any* reference to a goal that might impact on government? A man would commit no politically motivated crime if he threatened another man in a bar. However, if in the course of his threats he called his victim "a fascist," could a jury conclude .that his threats were designed to achieve a goal relating to government—the intimidation of one whose political beliefs differed from his own? Surely, due process requires that criminal statutes provide more guidance to the citizens. This is particularly true when the statutes impinge upon First Amendment protections.

Appellant's final claim is that although the language is vague the statute can be saved by severance of the unconstitutional section. However, appellant overlooks the fact that reading the statute as a whole, it is apparent that the "social or political goals" provision was intended to *limit* the reach of the entire statute. The Legislature did not intend to criminalize threats that were not made to achieve those goals. If this court were to strike the restriction, the effect would be to *extend* the reach of the law, thereby criminalizing conduct (threats made for purposes other than "political" or "social" goals) that the Legislature did not intend to penalize.

The rule governing severability is clear. "If the provisions are so interdependent that those which are invalid are to be regarded as the condition or consideration upon which others were enacted ... the entire statute must be held invalid." (*Hale* v. *McGettigan* (1896) 114 Cal. 112, 119 [45 P. 1049]; accord *People* v. *Barksdale* (1972) 8 Cal.3d 320, 333 [105 Cal.Rptr. 1, 503 P.2d 257].) The limitation the Legislature attempted to place on the reach of the statute, by confining it to situations in which "social or political goals" were present, is fundamental to the crime the Legislature attempted to punish. ■ ■ ■ ■ ■ This court cannot redefine that crime to include conduct specifically excluded by the Legislature in an attempt to save the statute from constitutional infirmity.[9]

---

[9]The statute contains a severability clause. (Stats. 1977, ch. 1146, § 2, p. 3685.) However, the presence of such a clause is not determinative of the issue of severability. "Such a clause, despite its positive terms, does not deprive the judiciary of its normal power and duty to construe the statute to determine whether the unconstitutional part

## III.

The phrase "social or political goals" is unconstitutionally vague. Since this section is vital to the statute, the court has no other choice than to find the statute unconstitutional.[10]

The judgment of dismissal is affirmed.

Tobriner, J., and Broussard, J., concurred.

**NEWMAN, J.,** Concurring.—A casual reader might infer that our holding perhaps affects current concern regarding international terrorism. But would that be a fair reading of the Chief Justice's opinion? I think not, and thus I concur (except that I would rely solely on the California Constitution).[1]

"The difference between domestic terror activity and international terror-violence should be noted . . . ." (Friedlander, *Terrorism and In-*

---

so materially affects the balance as to render the entire enactment void. If the court reaches the latter conclusion, it will annul the statute as a whole. [Citations.]" (*California Emp. etc. Com. v. Payne* (1947) 31 Cal.2d 210, 214 [187 P.2d 702]; accord, *Fort v. Civil Service Commission* (1964) 61 Cal.2d 331, 339-340 [38 Cal.Rptr. 625, 392 P.2d 385].) The vague language in this statute is fundamental to the crime defined by the Legislature. It cannot be severed from the balance of the statute without materially altering the whole. Therefore, the entire statute must be declared void.

[10]This disposition of the case renders it unnecessary to reach respondent's additional constitutional contentions. Respondent argues that the phrases "reasonably to be in sustained fear" and "climate of fear and intimidation" are unconstitutionally vague. In addition, he argued below that the statute was overbroad for it penalized speech protected by the First Amendment. Also, he contended that it violated equal protection by irrationally punishing only those who threaten in order to achieve "social" or "political" goals.

Although the Legislature may constitutionally penalize threats, even though they are pure speech, statutes which attempt to do so must be narrowly directed only to threats which truly pose a danger to society. (See e.g., *Rogers v. United States* (1975) 422 U.S. 35, 41-48 [45 L.Ed.2d 1, 7-11, 95 S.Ct. 2091] (conc. opn. of Marshall, J.); *Watts v. United States, supra,* 394 U.S. 705, 707-708 [22 L.Ed.2d 664, 667]; *United States v. Kelner, supra,* 534 F.2d 1020, 1027 [holding that a threat can be penalized only if "on its face and in the circumstances in which it is made [it] is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . ."].)

[1]This case is unlike *Sei Fujii v. State of California* (1952) 38 Cal.2d 718 [242 P.2d 617]. The dicta there regarding the United Nations Charter were discussed recently in Oliver, *The Treaty Power and National Foreign Policy as Vehicles for the Enforcement of Human Rights in the United States* (1981) 9 Hofstra L.Rev. 411, 413-418; and see *The Fujii Era and Beyond* in Lillich & Newman, International Human Rights: Problems of Law and Policy (1979) pages 53-122.

*ternational Law: What Is Being Done?* (1977) 8 Rut.-Cam.L.J. 383, 384.) Our court in this case does not fault the juridical use of the word "terrorism," and the century-old concept of "political offense" is not being challenged. (Cf. Rep. of United Nations Gen. Assem. ad hoc Committee on Internat. Terrorism (1973) 28 U.N. GAOR, Supp. 28, Doc. No. A/9028, p. 11 ("Work of the Sub-Committee of the Whole on the Definition of International Terrorism"); Dugard, *Towards the Definition of International Terrorism* (1973-1974) 67 Am.J.Int.L., Proc. 94: "[S]tates had accepted the principle of nonextradition in the case of *political offenders* by the middle of the 19th century"; further (p. 95), in the 1937 Convention for the Prevention and Punishment of Terrorism "Western powers retained their discretion to grant asylum to the *political offender*" (italics added); Bassiouni & Derby, *Final Report on the Establishment of an International Criminal Court for the Implementation of . . . Relevant International Instruments* (1981) 9 Hofstra L.Rev. 523, 590: "The 'political offense exception' is excluded from all international crimes herein"; cf. Friedlander, *supra*, at p. 383: "[T]here is still no acceptable legal definition of terrorism. Perhaps there need not be, if one deals with terrorism essentially as a criminal act." But see, e.g., 22 U.S.C. §§ 286e-11, 2753(f)(1), and 2371(a) ("international terrorism" affects U.S. aid to other countries).

**RICHARDSON, J.**—I respectfully dissent. In my view, the statutory provisions at issue (Pen. Code, §§ 422, 422.5) are not unconstitutionally vague.

The foregoing provisions, which are contained in a title of the Penal Code entitled "Terrorist Threats" (tit. 11.5), undoubtedly were enacted to proscribe threats of harm by persons seeking to advance some social or political goal rather than to accomplish a purely private or personal purpose. The majority holds that the limitational phrase "to achieve social or political goals" (§ 422.5) is "all-encompassing," providing "no limitation at all." (*Ante*, p. 384.) To the contrary, properly construed the provision reasonably confines the reach of these statutes in an entirely constitutional manner.

In his majority opinion written for the Court of Appeal, Second Appellate District, Division Five, in this case, Justice Stephens upheld the challenged provisions on the following basis: ". . . Webster's Third New International Dictionary (1966), at page 2161, defines 'social' as 'relating to or concerned with the welfare of human beings as members of society.' 'Political' is defined 'of or relating to . . . the conduct of gov-

ernmental affairs.' (P. 1755.) It is apparent that the Legislature contemplated the prohibition of threats under section 422 where they are made to advance the cause of an ascertainable group, or are made in furtherance of principles advocated by an ascertainable group, whether in a political or a more general (social) context. Conceivably, threats under section 422 would be prohibited where they contemplate some impact on the conduct of governmental affairs, regardless of the perpetrator's group affiliation. Clearly beyond the purview of the statute are threats made in a purely personal context, as in cases concerning strictly personal pecuniary gain (as in the case of blackmail) or as a result of personal rivalry." (Fn. omitted.)

I fully concur with, and adopt, Justice Stephens' cogent analysis. I further observe that even the dissenting opinion for the Court of Appeal, agreed that "the statute is not unconstitutional on its face.... [T]he adjectives 'social' and 'political' are sufficiently certain to protect the statute from the vice of vagueness." (Fn. omitted.) Rather, unlike the Court of Appeal majority, the dissenting justice did not believe that the challenged statutes properly applied to defendant's conduct, an issue which the majority herein does not decide and one which, accordingly, I do not address.

Our news media very frequently relate reports of threats of harm uttered by terrorists and others acting in the name of some social or political cause or group, or seeking to advance its aims. The statutory provisions struck down by the majority herein had served an important dual purpose of deterring such threats and subjecting to imprisonment those who made them, thereby inhibiting the subsequent acts of violence or terrorism which, sadly, so often follow.

I would uphold the statute.

Mosk, J., and White, J.,* concurred.

Appellant's petition for a rehearing was denied January 14, 1982. Kaus, J., did not participate therein. Tobriner, J.,† participated therein. Richardson, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.