[Civ. No. 31417. Fourth Dist., Div. One. May 1, 1985.]

In re JOHN V., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JOHN V., Defendant and Appellant.

762

**COUNSEL**

Jeffrey J. Stuetz for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Keith I. Motley and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WIENER, Acting P. J.**—It is an interesting phenomenon in our society that frequently the most pedestrian events can achieve constitutional status. In the "Fuck the Draft," free speech case of *Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780], Justice Harlan said: "This case may seem at first blush too inconsequential to find its way into our books, but the issue it presents is of no small constitutional significance." (*Id.,* at p. 16 [29 L.Ed.2d at p. 288].) We have similar feelings in this case where we are asked to determine whether John V.'s act of calling his neighbor a "fucking bitch" violated Penal Code section 415, subdivision (3).[1] That section makes it a misdemeanor for a person to use offensive words in a public place which are inherently likely to provoke an immediate violent reaction.

As we shall explain we reject John's several constitutional arguments and affirm the order modifying one of its probationary terms.

I

Sixteen-year-old John and Nancy W. are neighbors. John screamed "fucking bitch" at W. as she drove past his house, about 15 to 25 feet away. W. was startled. She felt fear and shock. When she arrived home she was

---

[1]All statutory references are to the Penal Code.

For convenience we omit subdivision referring to section 415(3) which reads in part: "Any of the following persons shall be punished by imprisonment in the county jail for a period of not more than 90 days, a fine of not more than $400 or both . . .:

". . . . . . . . . . . . . . . . . . . . . . . .

"(3) Any person who uses offensive words in a public place which are inherently likely to provoke an immediate violent reaction."

angry. Her anger then turned to fury. She became incoherent, enraged and humiliated. John had been screaming at her and calling her obscene names for about three years. Included within his repertoire of epithets were "whore," "fucking bitch," "bitch," and "fucking liar."

Police Officer Rebecca Bigbie responded to W.'s telephone call. John admitted to Bigbie he had a big mouth; he needed to learn to control it.

At trial John admitted hollering "fucking bitch" at W. because "she flipped me off as she was going by." Although W. conceded giving him a vulgar gesture ("the finger") on previous occasions she denied doing so on this day. On an earlier occasion John's obscene language made W. so angry she swung at him with a baseball bat. She missed and hit her boyfriend.

The court found John violated section 415(3) and ordered him placed on probation. One probation condition was that John was "to have no contact with W. directly or indirectly, nor [was he] to make any motions towards her or any comments to her or about her in her presence or out of her presence." John appeals.

## II

John contends section 415(3) is unconstitutionally overbroad and vague. He says the former condition violates his rights under the First Amendment of the United States Constitution and article I, section 2, subdivision (a) of the California Constitution; the latter violates his right to due process of law.[2]

Even though an overbreadth challenge is concerned with the risk of punishing a constitutionally protected right, in this case free speech, while a vagueness challenge is directed to due process, judicial responsibility in addressing both arguments is essentially the same.

A court should not find a statute facially overbroad when a limiting construction can be placed on it to remove the seeming threat to constitutionally protected speech. (*Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 613 [37 L.Ed.2d 830, 840, 93 S.Ct. 2908].) Similarly "[t]he judiciary bears an obligation to 'construe enactments to give specific content to terms that might otherwise be unconstitutionally vague.' [Citation.] . . . 'A statute will not be held void for uncertainty if any reasonable and practical

---

[2]The due process clause of the California Constitution is contained in article I, section 7, subdivision (a). All further constitutional references are to the federal Constitution there being no legal reason in this case for us to rely upon the California Constitution.

construction can be given its language.' [Citation.] If by fair and reasonable interpretation we can construe [a statute], to sustain its validity, we must adopt such interpretation.'' (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 253 [58 Cal.Rptr. 330, 599 P.2d 636].) Thus we proceed to answer John's dual constitutional attack by examining the language of the statute in light of its legislative and decisional history. (See *People* v. *Mirmirani* (1981) 30 Cal.3d 375, 383-384 [178 Cal.Rptr. 792, 636 P.2d 1130].) In doing so we must remember "[t]he meaning of the language of the statute can appear either on the face of the statute or from any 'established technical or common law meaning.' [Citations.]'' (*Ibid.*)

## A

To say we do not write on a clean slate on John's arguments is to understate the obvious. Section 415 in one form or another has had an interesting, dynamic and surprisingly long life. For a relatively innocuous misdemeanor it has traveled to high places: intrastate to the California Supreme Court in *In re Bushman* (1970) 1 Cal.3d 767 [83 Cal.Rptr. 375, 463 P.2d 727] and *In re Brown* (1973) 9 Cal.3d 612 [108 Cal.Rptr. 465, 510 P.2d 1017]; interstate to the United States Supreme Court in *Cohen* v. *California, supra,* 403 U.S. 15. These judicial experiences have been embellished by side trips to Sacramento where the Legislature has treated court-inflicted wounds. Full legislative revitalization was attempted in 1974 when section 415 was repealed and replaced by a new statute with the same number designed to meet constitutional limitations. Amendments were also made in 1976. (Stats. 1974, ch. 1263, § 2, p. 2742 amended by Stats. 1976, ch. 298, § 1, p. 606, see 2 Witkin, Cal. Crimes (1983 supp.) Crimes Against Public Peace and Welfare, § 621, p. 25.)

The statutory or common law counterparts to section 415 from other states are equally well traveled, having visited the United States Supreme Court on many occasions over the last 50 years. These cases, generally of humble origin, are microcosms of the political climate in our country at particular times and places. Viewed retrospectively they represent a continuum of judicial concern with the fundamental right to free speech protected by the First Amendment. Whether the problems of expression arise in the context of religion (*Cantwell* v. *State of Connecticut* (1940) 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352]; *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766]), civil rights (*Edwards* v. *South Carolina* (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680]; *Cox* v. *Louisiana* (1964) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453]; *Grayned* v. *City of Rockford* (1972) 408 U.S. 104 [33 L.Ed.2d 222, 92 S.Ct. 2294]), political disillusionment with the government and its treatment of blacks (*Street* v. *New York* (1969) 394 U.S. 576 [22 L.Ed.2d 572, 89 S.Ct. 1354])

or its involvement in Vietnam (*Cohen* v. *California, supra,* 403 U.S. 15; *Gooding* v. *Wilson* (1972) 405 U.S. 518 [31 L.Ed.2d 408, 92 S.Ct. 1103]; *Hess* v. *Indiana* (1973) 414 U.S. 105 [38 L.Ed.2d 303, 94 S.Ct. 326]), or potential interference with law enforcement (*Lewis* v. *City of New Orleans* (1974) 415 U.S. 130 [39 L.Ed.2d 214, 94 S.Ct. 970]), the United States Supreme Court has consistently, firmly and eloquently explained why abridgment of free speech will not be tolerated. Recognizing the First Amendment may be the "most majestic guarantee" (Tribe, American Constitutional Law (1978) § 12-1, p. 576), Supreme Court justices have repeated the principle that drafters of the Constitution "believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; . . . Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." (*Whitney* v. *People of State of California* (1927) 274 U.S. 357, 375-376 [71 L.Ed. 1095, 1105-1106, 47 S.Ct. 641] conc. opn. of Brandeis, J.) "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours." (*Cohen* v. *California, supra,* 403 U.S. at p. 24 [29 L.Ed.2d at p. 293].) "[I]t is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes." (*Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894].)

B

This historical perspective is important here for two reasons. The first is that these cases emphasizing the majestic guarantee of free speech highlight what the case before us is not about. Under no stretch of the imagination can John's comments be construed as having political or social import. Second, the foregoing authorities categorically state that protected free speech under the First Amendment is not without limitation. One such limitation is the "fighting words" exception as expressed in *Chaplinsky* v. *New Hampshire, supra,* 315 U.S. 568. ■ "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any

exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (*Id.,* at pp. 571-572 [86 L.Ed. at p. 1035], fns. omitted.) In California it is well established that the First Amendment does not protect words specifically addressed to another spoken under circumstances which create a clear and present danger that violence will imminently erupt. (*In re Brown, supra,* 9 Cal.3d at p. 618 explaining *Cohen* v. *California, supra,* 403 U.S. 15.) "[T]he mere use of a vulgar, profane, indecorous, scurrilous, opprobrious epithet cannot alone be grounds for prosecution. . . . The context in which the words are used must be considered, and there must be a showing that the words were uttered in a provocative manner, so that there was a clear and present danger violence would erupt." (*Jefferson* v. *Superior Court* (1975) 51 Cal.App.3d 721, 724-725 [124 Cal.Rptr. 507].) Although protected conduct may begin with the expression of opinion, it must stop with the perpetration of violence. (*In re Cox* (1970) 3 Cal.3d 205, 223 [90 Cal.Rptr. 24, 474 P.2d 992].)

The legislative response to judicial interpretation of the First Amendment has been prompt. In 1974, the United States Supreme Court in *Lewis* v. *City of New Orleans, supra,* 415 U.S. 130 declared a New Orleans ordinance unconstitutionally overbroad. The court explained that only "fighting words" or words which by their very utterance inflict injury or tend to incite an *immediate* breach of the peace could be proscribed. (*Id.,* at p. 133 [39 L.Ed.2d at p. 219].) The Legislature reacted to this decision by repealing section 415 and enacting a new section 415. (Stats. 1974, ch. 1263, § 2, p. 2742.) In 1976 section 415 was amended again to change the definition of "offensive" words. The phrase "inherently likely to produce a violent reaction" was replaced with "inherently likely to *provoke an immediate violent reaction. . . .*" (Stats. 1976, ch. 298, § 1, p. 606, italics supplied.) The Legislature made this further effort to insure the constitutionality of the statute. Aware of *Chaplinsky* and *Gooding* v. *Wilson, supra,* 405 U.S. 518, the Legislature attempted to remove all doubt about the constitutionality of section 415 by requiring the threatened breach of the peace be immediate. (*Review of Selected 1976 California Legislation* (1977) 8 Pacific L.J. 275.) ■ Section 415(3) as enacted and construed by the courts is not unconstitutionally overbroad.

## C

A vagueness argument necessarily concerns our interpretation of "words" which inevitably contain germs of uncertainty. There are limitations in the English language with respect to being both specific and manageably brief which present problems of interpretation. (*Broadrick* v. *Oklahoma, supra,* 413 U.S. 601, 608 [37 L.Ed.2d 830, 837, 73 S.Ct. 2908].) ■ But a

statute is not vague if an ordinary person exercising ordinary common sense can sufficiently understand and comply with its language. (*Ibid.*) Even though words may be marked by "flexibility and reasonable breadth, rather than meticulous specificity" it is sufficient if a statute gives fair notice to those to whom it is directed. (*Grayned* v. *City of Rockford, supra,* 408 U.S. 104 at p. 110.) " 'The presumptive validity of the legislative act militates against invalidating a statute merely ". . . because difficulty is found in determining whether certain marginal offenses fall within . . . [its] language" ' [citations.] We are not obligated to 'consider every conceivable situation which might arise under the language of the statute' [citation], so long as it may be given 'a reasonable and practical construction in accordance with the probable intent of the Legislature' [citation]." (*People* v. *Smith* (1984) 35 Cal.3d 798, 810 [201 Cal.Rptr. 311, 678 P.2d 886].)

■ Unless we are prepared to reject the "fighting words" exception to the First Amendment we must accept the premise that there are certain words in our society which when directly communicated to a person under certain circumstances will in fact provoke an immediate violent reaction. As infrequent as that situation may be we are satisfied it occurred in the case before us. We are hard pressed to think of a more volatile situation than the one here when John decided to provoke W. once again by calling her a "fucking bitch."

We understand "fuck" is now a ubiquitous term frequently heard in movies or songs or overheard in essentially every social environment. We are also aware *Cohen* explained "the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric." (*Cohen* v. *California, supra,* 403 U.S. at p. 25 [29 L.Ed.2d at p. 294].) But our concern is not with improving the auditory ambiance of the community by excising certain words which some may think are offensive. Rather it is with the right of the Legislature to assure public peace by proscribing conduct which causes violence. The statute as now rewritten with what we believe is the narrow specificity necessary to withstand constitutional scrutiny validly serves that purpose. As applied here it gave fair notice to John what he could not lawfully say to W. in a public place.

## III

John additionally argues the statute is unconstitutional because it lacks a scienter requirement. He includes in his parade of horribles a scenario describing the person whom he says can be unjustly convicted even though he or she did not reasonably know the words used were "offensive." Although

this may be a dramatic argument it is fallacious. Under such circumstances the person would not be guilty of section 415(3).

Section 20 provides that "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." ██ Section 415(3) is not a strict liability offense. ██ "A person does not act unlawfully where he commits an act under an honest and reasonable belief in the existence of certain facts and circumstances which, if true, would make the act lawful. 'When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them. [Citation.]'" (*People* v. *Rivera* (1984) 157 Cal.App.3d 736, 742-743 [203 Cal.Rptr. 842], quoting *People* v. *Scott* (1983) 146 Cal.App.3d 823, 831 [194 Cal.Rptr. 633].) ██ A defendant cannot be convicted under section 415(3) where from all the evidence the trier of fact has a reasonable doubt as to whether the defendant reasonably and in good faith believed the language used was not inherently likely to provoke an immediate violent reaction. (See *People* v. *Hernandez* (1964) 61 Cal.2d 529, 535-536 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092].)

John's arguments on vagueness and scienter are theoretical only. John is no stranger to either using or understanding vulgar words. He intentionally directed selected epithets at W. to provoke her. In light of the relationship between the parties his last recitation of these words in a public place created the clear and present danger that violence would immediately erupt. **(9)** (See fn. 3.) There is no basis to conclude the court applied the wrong legal standard. There is ample evidence to support the court's finding.[3]

IV

██ Consistent with our discussion of the protection afforded by the state and federal Constitutions we hold the court's probationary order re-

---

[3]John's opening brief contains a footnote in which he tersely states section 415(3) violates the equal protection clause of the United States and California Constitutions. He does not furnish us with the reasons for this statement. Presumably his contention is based on the different treatment afforded conduct as compared to speech. In other words he believes section 415(3) unlawfully discriminates against those who orally express obscene or vulgar words while excluding those who make similar expressions through informative gestures by hand, finger or otherwise. We do not view this distinction as being arbitrary. A state may distinguish between different groups of individuals provided the classifications created bear a rational relationship to a legitimate public purpose. (*In re King* (1970) 3 Cal.3d 226, 231 [90 Cal.Rptr. 15, 474 P.2d 983], cert. den. 403 U.S. 931 [29 L.Ed.2d 709, 91 S.Ct. 2249].) As difficult as it is to determine what is meant by "fighting words" at least this determination is legally and factually possible. It is virtually impossible to do the same with conduct. The Legislature simply decided to limit the scope of section 415(3) to words rather than under-taking the impossible task of including conduct. On this basis alone the distinction is rational. Section 415(3) is not unconstitutional on equal protection grounds.

straining John from making comments about W. out of her presence is invalid because it is overly broad, including situations which would effectively preclude John from discussing W. with anyone including his lawyer or members of his family.

## DISPOSITION

The probation condition preventing John from talking or commenting about W. out of her presence is stricken. Except as modified the order is affirmed.

Work, J., and Lewis, J., concurred.