Quinlan, Regina L., J.
This action brought by the Plaintiff Board of Managers of the Old Colony Village Condominium is seeking: in Count I a declaration that the Defendant Steven Preu has violated provisions of the Condominium documents and G.L.c. 183A, §6(a)(ii),[1] in Count II damages for the Defendant’s alleged nuisance, in Count III the Plaintiff seeks in-junctive relief, and in Count IV an award of attorneys fees and costs. The Defendant has denied the Plaintiffs allegations and opposes the issuance of an injunction and award of attorneys fees.
Pursuant to Mass.R.Civ.P. 65(b)(2), the court consolidated hearing on the Plaintiffs application for injunctive relief with the hearing on the merits.[2] The case was tried without a jury.
FINDINGS OF FACT
Based upon the credible evidence introduced at trial, the court makes the following findings.
The Plaintiff is the Board of Managers (hereinafter “Plaintiff’ or “the Board”) of Old Colony Village Condominium (hereinafter the “Condominium”), a condominium located in Orleans, County of Barnstable. The Board represents and acts for the Condominium’s organization of unit owners, the Old Colony Village Association. Ralph DiMonte is the designated manager of the Condominium.
The Defendant, Steven Preu (hereinafter “Defendant” or “Preu”), has resided in Unit #17 of the Condominium (the “unit”) since 1994. Initially he was a tenant of the unit owner. However, since 2000 he has owned and resided in the unit.
*131 The Condominium is a residential 143-unit condominium. The Condominium was created by Master Deed dated May 27, 1970 and recorded at the Barn-stable County Registry of Deeds at Book 1473 at Page 437. The Master Deed was amended on September 23, 1970, January 15, 1973, August 23, 1973, December 6, 1973, and most recently on July 28, 2009. All of the amendments were duly recorded.[3] The Master Deed as Amended on January 15, 1973 included inter alia paragraph 14 which provides that “All present and future owners . .. shall be subject to and comply with, the provisions of this Master Deed, the Unit Deed, the By-Laws and the Rules and Regulations . . . The acceptance of the deed or conveyance . . . shall constitute an agreement that (a) the provisions of this Master Deed . . . shall be deemed and taken to be covenants running with the land and shall bind any person having at any time any interest or estate in such unit . . ., and (b) a violation of the provisions of this Master Deed, the Unit Deed, by laws or Rules and Regulations . . . shall be deemed a substantial violation of the duties of the condominium unit owner.”
The original By-Laws of Old Colony Condominium were recorded on May 27, 1970 in the Barnstable Registry of Deeds at Book 1473 at Page 450. The By-Laws were amended on April 3, 1992 and on October 14, 1999. All of these amendments were duly recorded. In 2009, the By-Laws were amended and restated. That instrument was recorded on August 13, 2009 at Book 23961 at Page 47003. The 2009 Amended By-Laws were adopted and recorded after the filing of this action.
For the purposes of this decision, the court considers only the Master Deed, By Laws and Rules and Regulations as in effect at times material.
Article I, Section 4 of the By-Laws provides:
The provisions of these By-Laws, as they may be amended, shall govern Old Colony Village Association and shall apply to the Condominium and to the use and occupancy thereof. All present and future owners, mortgagees, lessees and occupants of the units . . . shall be subject to these By-Laws, the Master Deed, and the Rules and Regulations adopted pursuant thereto, as any of the same may be amended from time to time.
The acceptance of a deed or conveyance or the entering into a lease or the act of occupancy of a unit shall constitute an agreement that these ByLaws, the Rules and Regulations and the provisions of the Master Deed, as they may be amended from time to time, are accepted, ratified, and will be complied with.
Article V, Section 10 of the By-Laws provides:
Restriction on Use of Units. In order to provide for congenial occupancy of the Property and for the protection of the value of the units, the use of the property shall be restricted to and shall be in accordance with the following provisions.
(a) The apartment units shall be used for residences only.
(b) The common areas and facilities shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of the units.
(c) No nuisances shall be allowed in the Condominium nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession or proper use of the Property by its residents.
(d) No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Managing Board, whichever shall have the obligation to maintain or repair such portions of the Property.
Article V, Section 13 of the By-Laws provides:
Use of Common Areas and Facilities. A Unit Owner shall not place or cause to be placed in the stairways or other common areas or facilities, other than the areas designated as storage areas, any furniture, packages, or objects of any kind. The entry passages, stairways, corridors, and halls, shall be used for no purposes other than for normal transit through them.
Article V, Section 16 of the By-Laws provides:
Rules of Conduct. Rules and regulations concerning the use of units and the common areas and facilities, may be promulgated and amended by the Managing Board with the approval by vote of a majority of the unit owners voting at a duly called meeting. Copies of such rules and regulations shall be furnished by the Managing Board to each unit owner prior to the time when the same shall become effective. Initial rules and regulations, which shall be effective until amended by the Managing Board with the approval by vote of a majority of the unit owners voting at a duly called meeting, are annexed hereto and made a part hereof.
The Rules and Regulations applicable to the Plaintiffs claims were issued by the Board on or about August 16, 1996. Rules applicable to this action include Rule 5 of Rules relating to Units which provides:
Unit owners . . . are required to curtail any type of obnoxious, vexatious or irritating noise or behavior at all times.
Rule 3 of the Rules relating to Common Areas provides:
Fire doors within buildings shall remain closed at all times.
*132 The Rules and Regulations also provided for procedures to deal with infractions and established appropriate penalties. Rule 1 of the Rules governing Infractions and Fines provides in pertinent part:
1. The Property Manager will maintain a Log Book showing Unit Address, Owner/Tenant, Description of Infraction, Date, Time and Place of Infraction. If the Property Manager did not personally see the Infraction, he or she will list who reported, date and time it was reported and the person or persons who can corroborate the Infraction.
a) A written warning will be given to the Unit Owner . . .
b) If the Infraction is committed again a $25.00 fine will be imposed on the Unit. The Landlord/Tenant will have 10 days to pay the fine and or appeal to the Managing Board. The Board reserves the right to impose late charges of 1.5% per month on balances over 30 days.
c) If an infraction is committed again, the Managing Board will increase the fine by $25.00 for that and every subsequent Infraction up to a maximum fine of $100.00. If the Owner/Landlord/Tenant does not abate or remedy the Infraction or if the Infraction is one of a continuous occurring nature, the Managing Board will continue to place a $100.00 fine on the Unit on a monthly basis and assessed as of the first day of the month.
The Plaintiff alleges that the Defendant has been acting in a destructive, abusive, and disruptive manner for approximately five (5) years. The problems began in 2004 and tensions have escalated since then. Prior to that time there were no complaints concerning the Defendant and he and Ralph DiMonte had a cordial relationship.
Janet Young owns the unit directly above the unit owned and occupied by the Defendant. She purchased that unit in 2003. Before moving in, Ms. Young did some renovations including removal of the old carpeting and pad and replacing them with new carpeting. When she first moved in, the Defendant went to her unit to meet her and welcome her to the Condominium. Soon thereafter, she and the Defendant developed a veiy antagonistic relationship due primarily to noise emanating from one unit to the other.
The core of their troubles stems from the fact that soundproofing between the units is poor. Even the most personal and private activities in one unit are clearly audible in the other. The poor soundproofing was confirmed by Ralph DiMonte, the condominium manager, who testified that he has received a lot of complaints about noise from unit owners, including the defendant and Ms. Young.
The Plaintiff was alerted to the problems between Ms. Young and the Defendant orally, in writing and at the Board meeting in March of 2008. By letter dated February 12, 2004, Ms. Young filed a formal complaint with the Plaintiff against the Defendant after having lived in her unit for only six months. Ms. Young complained of “obnoxious, vexatious or irritating noise or behavior” by the Defendant. (Ex 31.) Ms. Young complained inter alia of the Defendant’s language and of noises from his unit. She complained about the Defendant having come to her unit, knocked on her door, and complained about noise emanating from her unit.[4] Ms. Young requested that the Plaintiff take whatever action was necessary to correct the situation.
Apparently, the Plaintiff did not take any action to correct the situation. In May of 2006, Ms. Young made her complaints to the police. On May 22, 2006 at 2350 hours,[5] Ms. Young called police “to have an incident put on record.” According to the report, she advised police that she had dropped a magazine on the floor of her apartment, when her neighbor downstairs yelled back to her, “God damn you, you F — ing cunt.” Ms. Young stated this was an ongoing problem and asked that she be able to leave a message with the detectives. No action was taken by the police.
On October 18, 2006 at 2117 hours, Ms. Young again called the police to complain about noise from the Defendant’s unit, i.e., loud music at first followed by noise from a machine. According to the report, when police arrived at 2141 hours there was no violation. The responding officer spoke first with Ms. Young and then with the Defendant. The Defendant said he had used a guitar earlier. After inquiry concerning the vibrating noise, the officer was shown the fan in the bathroom and concluded that the fan was the source of the vibration complained of by Ms. Young. The officer wrote, “I personally considered the sound minimal and not something that warranted a complaint.”
The Defendant acknowledged to the officer that complaints of noise had been a continuing problem between himself and Ms. Young. The officer recommended that the Defendant “seek assistance through the building complex management.” No charges were ever filed by the police against either Ms. Young or the Defendant as a result of noise complaints. Neither the Defendant nor Ms. Young received any assistance from the management of the condominium.
Ms. Young no longer lives in the unit, having moved in January of 2008. She does still own her unit. Since moving in January of 2008, Ms. Young has had no direct interactions with the Defendant. She did, however, rent her unit. In the summer of 2008, there were problems the Defendant attributed to Ms. Young’s tenants including noise, a suspicious fire and stolen bikes. With respect to one tenant, the Defendant claimed that the tenant gave a key to a person who set fires in the building. He also complained to Ms. Young’s realtor that there were noise problems in Ms. Young’s unit which he attributed to her removal of the old rug and replacing it with a thin rug having no pad.
*133 The Plaintiff also received complaints about the Defendant from another unit owner. By letter dated August 20, 2008, unit owner Martha Mathison, a friend of Ms. Young, wrote to Ralph DiMonte (at his request) concerning the Defendant. Her complaint related to the Defendant’s placing fans in the common hallways on the second floor and his closing of fire doors between units 210, 211, 212 and 217. In the letter, Ms. Mathison reported that she spoke to the Defendant about the fans and he responded that there was a stench in the hallways which he was trying to alleviate. When she asked the Defendant to leave the door open out of consideration for his neighbors, the letter reports that he said, “You are making a mistake messing with me.” Although the letter is dated August 20, 2008, it includes the following: “As of today, Sept. 2, 2008, the fan(s) situation has ended - except for days when Mr. Preu runs them in his OPEN doorway!” She also reported that the fire door continued to be closed. Ms. Mathison did not testify.
The issue of hall doors remaining open or closed found its way to the Building Department. On October 29, 2008, Ralph DiMonte filed a complaint that the Defendant was “tampering with fire safety equipment” by closing fire doors that are designed to be left open and by opening a fire door next to his balcony which is required to be left closed. On November 5, 2008, the Building Commissioner wrote to the Defendant and told him that doors in hallways should not be wedged open because it is a violation of the Massachusetts State Building Code, §780 Code Mass.Regs. §716.5 and 780 Code Mass.Regs. §1015.4.1. The Commissioner wrote, “Please reframe [sic] from wedging the doors open in the hallways of your building ...”
Not to be outdone, on November 11, 2008, the Defendant filed a complaint with the Building Department concerning doors in the Condominium being kept open with hold-open devices in the spring and summer. By letter dated November 19, 2008, the Building Commissioner told Ralph DiMonte that the hold-open devices on some of the hallway doors within the egress corridors had the same public safely implications as the door wedges and directed that they be removed. In December of2008, the Building Commissioner wrote to Ralph DiMonte. Ralph DiMonte testified that the Defendant has not opened or closed doors in the common areas since November of 2008.
The Defendant’s relationship with the current president of the Plaintiff, Gerard Ritzinger, and its resident manager, Ralph DiMonte, has been problematic since 2008.
Mr. Ritzinger has known the Defendant for approximately 3 1/2 years. On or about March 20, 2008, the Defendant attended a Board Meeting. According to Mr. Ritzinger, the Defendant raised issues concerning settlement and structural issues. Not satisfied with the Plaintiffs response, the Defendant yelled that the building was falling apart and the Plaintiff was doing nothing about it. The Defendant threatened to call his sister who was an attorney and stormed out of the meeting. His comments concerning the Board’s response were laced with profanity. Ralph DiMonte described the Defendant’s tone at the meeting as loud and aggressive. According to Mr. Ritzinger, the Defendant’s conduct was brief and did not cause the Plaintiff to suspend the meeting.
The Defendant’s version of the meeting is different. According to the Defendant, the attorney for the Board was explaining rules when the Defendant claims that the Plaintiffs attorney was rude to a neighbor. The Defendant says he told the attorney to stop and that prompted the response, “I don’t work for you.” The Defendant also testified that he raised the issue of Mr. Ritzinger and his dog. That prompted a response, “Be quiet or I will throw you out.”
The court accepts testimony to the effect that the Defendant attended the meeting, raised concerns about structural issues and noise and exchanged angry words creating a brief disruption of the meeting which did not require that the meeting be suspended.
Following the meeting, counsel for the Condominium wrote to the Defendant concerning his conduct at the meeting of March 20, 2008. In his letter, counsel stated:
Your words and conduct at the March 20, 2008 meeting shall be considered misconduct. The Board will not tolerate such conduct at its meetings. If such inappropriate conduct is repeated at future trustee meetings you shall be prohibited from attending future meetings, and the board shall levy a fine and may seek legal remedy.
While acknowledging that the Defendant had “some concerns regarding the condition of the common areas and [his] unit,” the Defendant was directed not to communicate with any Board members concerning Condominium matters. Counsel continued, “All communications, including issues dealing with the common areas and your unit, must be in writing and sent to the attention of the property manager, except in the event of an emergency that warrants otherwise.” Counsel then stated:
Lastly, my clients inform me you have reported problems with the common areas, cracks in your unit, and transfer of sound from the unit above yours. As for the common area concerns, please send to the property manager in writing your specific issues dealing with what you believe are common area problems. As for problems with your unit, you are responsible for maintenance and repair of your unit. As such, we suggest you arrange for an inspection of your unit by a professional to assess any problems with your unit. If the professional indicates a common area problem, kindly submit the report to management for review and appropriate action.

*134
Lastly, you have complained about noise being transferred from the unit above your unit and have requested additional soundproofing be installed. However, as your complaint appears to be with carpet padding in the unit above you, you must address this with the owner of this unit directly.

Following receipt of the letter from counsel, the Defendant neither attended nor disrupted any further Board meetings. The structural issues raised by the Defendant continued and have yet to be finally resolved.
According to Mr. DiMonte, if a unit owner raised a concern about common areas, the Board would look into the matter. It was not common practice to direct the unit owner to hire an engineer. As directed, the Defendant did engage the services of an engineer. By letter dated September 12, 2008, based upon a visual inspection, the Defendant’s engineer concluded that in the engineer’s opinion a section of the building has “experienced some noticeable long term foundation or framing settlement.” The engineer recommended that there be a full evaluation by a structural engineer. A copy of the letter was transmitted to the Plaintiff.
The Plaintiff consulted an engineer. By letter dated January 16, 2009, the Plaintiffs engineer concluded that, based upon a visual inspection, it appeared
that only typical movement has taken place within the building’s foundation perimeter, with no evidence of significant structural movement that would cause life safety concerns. The movement has resulted in aesthetic, and/or fit and finish issues that most likely will have to be addressed periodically over the lifetime of the building. We further conclude that outboard of the main building wall, some movement appears to have taken place. Although this movement does not appear to be a life safety issue, we do not know the cause of the movement, and recommend further investigation to determine the cause and remedy for this issue.
With respect to the structural dispute between the Defendant and the Plaintiff, resort was also made to the Building Department of the Town of Orleans in March of 2009, when the Defendant filed a complaint about the structural integrity of the building. As of April 13, 2009, the Building Inspector had reviewed the inspection reports but notified the parties that he had not formed an opinion concerning alleged structural deficiencies in the Defendant’s building. He recommended that the parties hire an independent engineer to review the two engineering reports.
Although the Defendant did not attend any further meetings of the Plaintiff, his interactions with Mr. Ritzinger and Ralph DiMonte were less than cordial. On two occasions, the Defendant placed bags containing dog feces at Mr. Ritzinger’s door. The Defendant admits to having done so, explaining that he twice observed Mr. Ritzinger allowing his dog to defecate without cleaning up after the dog. As a result, the Defendant states he placed the feces in a plastic bag and left them at Mr. Ritzinger’s door. Mr. Ritzinger denies failing to clean up after his dog.
As a result of the strained relationship, Mr. Ritzin-ger would try to avoid the Defendant. During the past year, when they did see each other in passing, the Defendant would usually give the finger gesture to Mr. Ritzinger. Mr. Ritzinger also received frequent complaints from Ralph DiMonte about the Defendant. He complained about the Defendant giving the finger as he passed the security cameras in the halls of his building and about the comments on the Defendant’s monthly common areas fee checks.
On September 11, 2008, Ralph DiMonte had called police to complain of messages left by the Defendant on his voice mail. Det. Higgins listened to the messages, which were derogatory to Ralph’s ethnic background. There were no threats in the messages. No action was taken by police.
The Defendant frequently complained and criticized the quality of Ralph DiMonte’s work and the condition of the common areas. Beginning in or about August 2008, the Defendant began posting handwritten notes or signs complaining about Ralph DiMonte’s management, e.g., “Ralph Clean these carpets! Earn your $90,000.00 for a 4 day work week” and “Ralph’s son just cleaned this carpet. Like the job? It only costs us $115,000.00 ayear to hire them!” The Defendant also sent typed letters to neighbors complaining about the condition of the halls and about attempts of the Plaintiff to change rules relating to doors without a vote of the unit owners.
The Defendant admits to having been aware of policies concerning placing items in the common areas and regarding nuisances. With respect to the signs, the Defendant posted them in the trash room. At the time, he was not aware that it was prohibited. He now is.
As a result, on or about September 8, 2008, the Plaintiff, by and through its counsel, sent the Defendant, via first class mail and certified mail, return receipt requested, another Notice of Violation. In this Notice of Violation, the Defendant was directed not to close fire doors in the halls except in the event of a fire emergency. The letter also directed the Defendant to “cease having any direct communication with Mr. DiMonte or any other employee of the Trust, except in the event of an emergency that warrants otherwise, [sic] Demand is further made that you cease and desist from posting any notices upon the common areas or under doors. Any and all future complaints, such as complaints, requests for repairs etc., must be made in writing and mailed to the management office at 42 Old Colony Way, Orleans, MA 02653, again except in the event of an emergency that warrants otherwise.” The Defendant was further advised that the Plaintiff considered his conduct to be in violation of the condominium documents and G.L.c. 183A.
*135 Following receipt of the letter of September 8, 2008, the Defendant ceased posting signs and notices. However, whenever the Defendant saw Ralph DiMonte or Mr. Ritzinger, he stuck up his middle finger while gesturing towards them or, to use counsel’s description, “flipped them the bird.” The Defendant said that the gesture means “go screw yourself.” He also continuously sticks up his middle finger toward the internal surveillance cameras in the corridors of his building. When the Defendant sends in his monthly condominium fee payments, he writes insulting messages within the memo section of the checks, e.g., “Babysitting retards,” and “screw Ralph.” The most recent is dated March 1, 2009, which states, “Bald lawyers and midget janitors don’t scare me.”
On or about October 29, 2008, the Plaintiff, by and through their counsel, sent the Defendant’s counsel a third letter giving the Defendant notice of an alleged violation based on his obscene gestures toward the Board members, placing dog feces in the common areas, making insulting and offensive statements on his monthly condominium common fee payments, continued posting of signs to harass and defame Condominium staff, and continued obstruction of fire doors. Counsel stated:
Accordingly, final demand is hereby made that your client Cease and Desist from further harassing any Board members or employees either by personal contact or by posting signs, your client cease and desist from writing harassing notes and memos on checks for payment of common fees to the Association, your client cease and desist from propping open those fire doors designed to be left open and your client cease and desist from propping open those doors which are required to be kept closed by law because they do not have automatic door closers.
Be advised that any checks containing offensive, obj ectionable or harassing written language will not be accepted for payment of the monthly common fees.
In the spring of 2009, the Plaintiff sought help from the Orleans Police Department with respect to their claims against the Defendant.
On May 14, 2009, the Defendant learned that Chief Jeffrey Roy wanted to see him. He made arrangements to see him the next day, May 15th, at the police station. At the station, Chief Roy told the Plaintiff that he was revoking his license to carry a firearm. The Defendant also had a firearm identification card which was not revoked or suspended. Chief Roy told the Defendant that he did not need to turn his revolver in. Instead, he told him to sell it, which the Defendant did.
On May 14, 2009, a constable came to the Defendant’s unit to serve him with process in this action. The Defendant testified that when the constable attempted to push his way into the unit, the Defendant closed the door and called the police. When police arrived, the Defendant was visibly upset, reporting that the constable had tried to force his way into his unit. The police handed the Defendant the pleadings in this action and told him to consider himself served. When the police left, the Defendant, still extremely upset, called Mr. Ritzinger. The Defendant left a voice message laced with profanity, again called Mr. Ritzinger a Nazi and threatened to humiliate him. Mr. Ritzinger called the police and played the message. Police visited the Defendant and advised him of the consequences of making harassing calls and told him not to call Mr. Ritzinger again. No charges resulted from Mr. Ritzinger’s complaint nor have there been any further telephone calls.
The Defendant saw his primary care doctor on May 15,2009 because his medication had run out. In 2005, the Defendant had been diagnosed with inoperable brain lesions. He takes medications for seizures and anxiety, and suffers from forgetfulness, disorientation, anxiety, and other symptoms related to his illness and medications. For example, on June 25, 2006, the police, responding to a call, found the Defendant dressed only in jogging pants. He appeared disoriented and was taken to the hospital. Officers checked his unit and found the door open. Inside, they observed seizure medication. They attributed the Defendant’s condition to a possible seizure.
As the constable was attempting to effectuate service of process on the Defendant, the Defendant became irate and began shouting profanities at the constable. Accordingly, the Orleans Police were once again summoned to the Condominium.
On May 15, 2009, after the doctor visit, the Defendant returned home to await delivery of a prescription from the pharmacy. His physician prepared the necessary paperwork to effectuate an involuntary commitment pursuant to G.L.c. 123, §12. At approximately 5:00 pm, five Orleans police officers with guns drawn implemented the commitment order. A phone call was placed to his telephone number. Police entered the unit and placed the Defendant on the floor and handcuffed him.
Police asked for and received permission to search his unit for weapons. They found three flintlock weapons and five flintlock replicas, all of which were used by the Defendant in his pirate demonstrations. The weapons were not loaded, nor was ammunition found, nor was it certain whether any were operable. Det. Higgins described the Defendant’s demeanor during the implementation of the commitment order as calm and cooperative. Once outside, there was an ambulance waiting and the handcuffs were removed. The Plaintiff introduced surveillance still photographs of the Defendant being removed from the building by police on May 15th. The Defendant was transported to the hospital where he remained for some twelve days. During his hospitalization, the Defendant’s med *136 ications were adjusted. Since returning to the condominium, the only complaint has been one by the Defendant to the Orleans Police complaining of noise by tenants in the Young unit.
RULINGS OF LAW
The Plaintiff asserts four claims against the Defendant, a claim for declaratory relief in Count I, a claim for nuisance in Count II, a request for injunctive relief in Count III, a claim for attorneys fees in Count IV. All of the Counts arise from alleged misconduct of the Defendant which the Plaintiff asserts to have been in violation of the Master Deed, By-Laws and Rules and Regulations of the Condominium and to be misconduct for the purposes of G.L.c. 183A, §6(a)(ii).
Defendant’s Alleged Misconduct and Nuisance
“ ‘Ownership of a condominium unit is a hybrid form of interest in real estate, entitling the owner to both ’’exclusive ownership and possession of his unit, G.L.c. 183A, §4, and ... an undivided interest [as tenant in common together with all the other unit owners] in the common areas . . ." ’ Noble v. Murphy, 34 Mass.App.Ct. 452, 455-56 (1993), quoting from Kaplan v. Boudreaux, 410 Mass. [431] at 438 [(1991)]. It is ‘[t]his division between individual and common rights [that] is basic to the theory of condominium ownership’ and required the Legislature to enact G.L.c. 183A. Golub v. Milpo, Inc., 402 Mass. 397, 401-02 (1988). Condominium ownership ‘affords an opportunity to combine the legal benefits of fee simple ownership with the economic advantages of joint acquisition and operation of various amenities including recreational facilities, contracted caretaking, and security safeguards.’ Noble v. Murphy, 34 Mass.App.Ct. at 456." Busalacchi v. McCabe, 71 Mass.App.Ct. 493, 499 (2008). “In keeping with this division of property ownership, condominium unit owners cede the management and control of the common areas to the organization of unit owners, which is the only party that may bring litigation relating to the common areas of the condominium development on their behalf. G.L.c. 183A, §10(b)(4) . . .” Berish v. Bornstein, 437 Mass. 252, 263 (2002).[6]
“Although misconduct is not defined in the statute [G.L.c. 183A, §6(a)(ii), misconduct of a unit owner is the ’’failure to abide by the requirements of [G.L.c. 183A] or the requirements of the master deed, trust, by-laws, restrictions, rules or regulations [of the organization of unit owners]." Trustees of Hunters Village Condominium Trust v. Gerke, 71 Mass.App.Ct. 1126 (2008).
The court has heard the testimony of witnesses and had the opportunity to observe their demeanor and to assess their credibility. Of necessity, this case involves a balancing of significant interests in the condominium; the interest of the Plaintiff in enforcing rules and regulations and fostering a peaceful living space for residents and the ownership interest of the Defendant to the quiet enjoyment of his unit. Although various claims will be considered individually, the court is not unmindful of the larger context and of resulting strain in the relationship between the Plaintiff and the Defendant.
The Plaintiffs claim that the Defendant has violated provisions of the Master Deed which prohibit Unit Owners from making nuisances or making improper, offensive or unlawful use of the Condominium Property and prohibiting the placing objects of any kind in the Condominium common areas. Paragraph 14 of the Master Deed provides that unit owners are subject to and must comply with, the provisions of this Master Deed, the Unit Deed, the By-Laws and the Rules and Regulations.
G.L.c. 183A, §11 provides that the By-Laws for the Condominium Association shall provide “[s]uch restrictions on and requirements respecting the use and maintenance of the units and the use of the common areas and facilities, not set forth in the master deed, as are designed to prevent unreasonable interference with the use of their respective units and of the common areas and facilities by the several unit owners.” Article I §4 of the By-Laws provides that all unit owners are subject to the “By-Laws, the Master Deed, and the Rules and Regulations adopted pursuant thereto, as any of the same may be amended from time to time.”
Article V, Section 10 of the By-Laws, as in effect since 1996 and at times material hereto, restricts the use of units by requiring that no nuisances or any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession or proper use of the Property by its residents. Rule 5 of the Rules governing Units in the Rules and Regulations requires that unit owners curtail any type of obnoxious, vexatious or irritating noises or behavior.
The condominium documents set forth the terms of the contract between the individual unit owners and the organization of unit owners of the Condominium. In construing the terms used, rules of contract interpretation apply. The court must “construe all words that are plain and free from ambiguity in their usual and ordinary sense.” Suffolk Construction Co., Inc. v. Lanco Scaffolding Co., Inc., 47 Mass.App.Ct. 726, 729 (1999), as quoted in Davilas v. Bader, 2007 WL 2367782 (Mass.Super. 2007) [22 Mass. L. Rptr. 691].
The Plaintiff asserts that the Defendant has engaged in misconduct which is improper, offensive and unlawful and also that he has violated the rules by placing objects in hallways and that conduct constitutes a nuisance interfering with the rights of unit owners to the quiet enjoyment of their units.
Black’s Law Dictionary 1096 (8th ed. 2004) defines “nuisance" as “1. A condition, activity, or situation (such as a loud noise or foul odor) that interferes with the use or enjoyment of property; esp., a nontransitory condition or persistent activity that either injures the physical condition of adjacent land or interferes with its use or with the enjoyment of easements on the land or of public highways.” As quoted in Town of Uxbridge v. Griff, 68 Mass.App.Ct. 174, 177 n.5 (2007).
*137 Creation of a nuisance or engaging in offensive conduct may constitute misconduct. However, as the Supreme Judicial Court has stated, a Plaintiff claiming a private nuisance bears a “heavy burden.” Rattigan v. Wile, 445 Mass. 850, 855-56 (2006). “The law of nuisance ‘does not concern itself with trifles, or seek to remedy all the petty annoyances of everyday life in a civilized community.’ ” Id., quoting W.L. Prosser & W.P. Keeton, Torts §88, at 626 (5th ed. 1984). As stated by the Court quoting the Restatement (Second) of Torts §822 comment g, at 112 (1979),
Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others ... Liability for damages is imposed [only] in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation.
“[T]he plaintiffs must [show] that the Defendant! ] caused ‘a substantial and unreasonable interference with the use and enjoyment of the property’ of the plaintiff. . . The injury or annoyance must have substantially interfered ‘with the ordinary comfort... of human existence,’ or have been substantially detrimental to the ‘reasonable use [ ] or value of the property.’ ” Rattigan, supra at 856-57.
Generally, to establish a nuisance the Plaintiff must establish that the Defendant’s conduct was an “intentional invasion of another’s interest in the use and enjoyment of land to be unreasonable if the ‘gravity of harm’ caused thereby ‘outweighs the utility’ of the actor’s conduct ... Where the actor’s sole purpose’ ‘is to annoy and harm his neighbor,’ the law recognizes no utility...” Id.
The Plaintiff primarily relies upon the problems between the Defendant and Janet Young to support its allegation of nuisance. There were clearly problems between the two stemming from noise emanating from one unit to the other. According to Mr. DiMonte, there are problems which cause frequent complaints of noise not only from the Defendant and Ms. Young but also from other unit owners. It is significant to the court that the noise complaints were limited to the Defendant and Ms. Young (and later her tenants) and that they had no impact on the common areas and facilities. The only evidence from a third parly concerning the level of noise disturbance attributed to the Defendant was from the police officer responding to Ms. Young’s call. He spoke with both Ms. Young and the Defendant and listened to the fan noise which was annoying Ms. Young and did not consider the noise excessive. It was the police officer who recommended that they seek assistance from management. They did so to no avail. In fact, in the March 27, 2008 letter, counsel expressly told the Defendant his noise problems with the owner of the unit upstairs were not the concern of the Board and he should deal with her directly.
The Rules and Regulations of the Condominium which have been in place since 1996 provide a process for dealing with infractions. There is no log of noise complaints made by Ms. Young, by other unit owners or by or against the Defendant as required by the rules governing infractions. Nor is there any log of complaints made by Ms. Young concerning the Defendant’s vulgar language.
There was no warning given to the Defendant. In fact, in the letter to the Defendant from Plaintiffs counsel dated March 27, 2008, the Plaintiff expressly told the Defendant that he “must address this [noise complaint] with the owner of this unit directly.” That directive was never rescinded. Having told the Defendant to deal with Ms. Young directly, the Plaintiff cannot now claim this to be a violation of the By-Laws or the Rules and Regulations particularly where, according to counsel for the Plaintiff, the ongoing noise dispute between the Defendant and Ms. Young did not involve the common areas and facilities and did not impact any other unit.
Under these circumstances, the problems between the Defendant and Ms. Young are not deemed to be a nuisance to the Plaintiff or misconduct involving violations of the Rules and Regulations for the purpose of this action.[7]
The second claim of improper conduct in violation of the Master Deed, By-Laws and Rules and Regulations relied upon by the Plaintiff is the disruption of the March 2008 meeting of the Board.[8] For the purposes of this decision, the court assumes that the Defendant’s conduct disrupting the meeting (even if only briefly) violated the Rules and Regulation prohibiting a practice which is a source of annoyance to residents.[9] Consistent with the Infraction process outlined in the Rules and Regulations, in the letter dated March 27, 2008, counsel for the Plaintiff issued giving notice of the alleged misconduct and the following warning to the Defendant:
Your words and conduct at the March 20, 2008 meeting shall be considered misconduct. The Board will not tolerate such conduct at its meetings. If such inappropriate conduct is repeated at future trustee meetings you shall be prohibited from attending future meetings, and the board shall levy a fine and may seek legal remedy.
Since that time, there has been no further inappropriate conduct at Board meetings because the Defendant has not attended any Board meetings since that time.
At the same meeting which precipitated counsel’s letter of March 27, 2008, the Defendant complained of structural issues. It appears his issues were not addressed by the Board except to direct that he retain an engineer to submit a report. According to Mr. DiMonte, this was not consistent with the Board’s usual response of having someone look at a problem area brought to the Board’s attention by a unit owner.
The Plaintiff also asserts that the Defendant violated Article V, Section 13, of the ByLaws, which *138 prohibits a Condominium owner from placing in the common areas “any furniture, packages, or objects of any kind.” This complaint relates to the Defendant posting hand-made signs in the trash area signs regarding the cleanliness of the Condominium common areas, as well as leaving a note on a neighbor’s door, placing fans in the corridor outside his unit and places the bags of dog feces at Mr. Ritzinger’s door.
The Defendant frequently expressed dissatisfaction with the management under the direction of Mr. DiM-onte and would post notices expressing his complaints in the trash room, a common area. This was a source of consternation by Mr. DiMonte who considered the Defendant’s language offensive and defamatory. Mr. DiMonte complained to the Board or to Mr. Ritzinger. By letter dated September 8, 2008, counsel for the Plaintiff notified the Defendant that this was deemed misconduct and a violation of the Condominium Documents. This letter consisted of a warning consistent with the provisions governing infractions. The Defendant was directed to cease direct communications with Mr. DiMonte or members of the staff and to cease posting signs in the common areas.
Assuming arguendo that signs or notes constitute “objects of any kind” under the By-Laws, it is clear that “communication by signs and posters is pure speech.” Nyer v. Munoz-Mendoza, 385 Mass. 184, 188 (1982) (discussing First Amendment where landlord obtained injunction prohibiting tenant from posting signs). Thus, the Plaintiff could only regulate the Defendant’s signs or notes — which were clearly communications because they contained messages to other unit owners — if it had a “right to restrict speech on the basis of legitimate State or private interest” and used means “precisely and narrowly drawn so as to avoid unnecessary restriction of constitutionally protected liberty.” Nyer, 385 Mass. at 188.
Avoiding criticism of Mr. DiMonte’s work is not a legitimate interest sufficient to proscribe the Defendant’s right to freedom of speech. Id. Cf. Organization for a Better Austin v. Keefe, 402 U.S. 415, 419-20 (1971) (vacating injunction prohibiting pamphleteering critical of business practices because unconstitutional prior restraint on free speech). Because the By-Law has been construed by the Plaintiff to prohibit the Defendant from posting signs or notes that are protected by the First Amendment, it is an unreasonable restriction and the court will not rule that the Defendant violated the condominium documents or engaged in misconduct by posting signs in the trash room or by leaving a note at a neighbor’s door See Noble v. Murphy, 34 Mass.App.Ct. 452, 457, 459 (1993) (noting that standard for condominium use restrictions is “equitable reasonableness,” and restriction that abrogates fundamental constitutional right is invalid).
The court also notes that once the Defendant was told not to post signs, he stopped doing so.[10] The Defendant did, however, continue to communicate with Mr. DiM-onte by putting memos on his common area fees checks and by making silent gestures in the direction of security cameras as well as to Mr. DiMonte and Mr. Ritzinger commonly referred to as “flipping the bird” meaning, according to the Defendant, “screw you.” Both of the foregoing are intended as communications. The gestures to individuals were not made when they were in close proximity to each other or during any confrontation but when they happened to see each other. The First Amendment considerations notwithstanding, this type of conduct is not conduct constituting a nuisance which would justify an injunction.
By letter dated September 8, 2008, counsel for the Plaintiff directed communication be in writing to avoid any potential confrontational situations. The letter is a warning for the purpose of the Rules governing infractions. Notwithstanding the warning, the Defendant did call Mr. Ritzinger on May 14, 2009, leaving a particularly offensive message. According to the Rule governing infractions, this subsequent infraction may be subject to a $25.00 fine. However, such a fine was never imposed.
The fans and dog feces stand in a different posture than the signs. According to the Defendant, the fans were intended to clear the air from a smell in the corridor. However, they were “objects of any kind” in the common areas. His reasons for doing so are irrelevant. There is no evidence he has continued to put fans in the common areas following receipt of the warning. Ms. Mathison’s note indicated the Defendant stopped doing so in September of2008. In fact, he has resorted to putting the fan in his open doorway.
Twice dog feces were left in plastic bags at Mr. Ritzinger’s door. These also would be considered “objects of any kind” allegedly because the Defendant saw him allow his dog to defecate in an area where such conduct is prohibited. Irrespective of the reason, leaving these bags in the common area did violate Rule 3 of the Rules and Regulations governing common areas and justified the warning in the letter from counsel of October 29, 2008. There is no evidence that the Defendant has engaged in this misconduct since the warning issued.
With respect to the fire door issue, the Defendant violated Rule 3 of the Rules and Regulations governing common areas. His conduct concerning the doors in the common areas justified the warning in counsel’s letter of October 29, 2008. That issue appears to have been resolved in November of 2008 following correspondence from the Building Commissioner. However, absent the log required to be kept by the Rules and Regulations, the court cannot determine on how many occasions after the warning the Defendant interfered with the doors in the common area.
By letter dated October 29, 2008, the counsel for the Plaintiff also warned the Defendant of potential misconduct including the notes on checks, the silent finger gestures to security cameras and to Mr. DiMonte and Mr. Ritzinger. As noted earlier notes on checks and the gestures are forms of speech which the court does not *139 consider violations of the Rules and Regulations, particularly in light of the restrictions of the Plaintiff having direct communications with the Board, counsel and staff. However, the Plaintiff is not without recourse and can impose reasonable restrictions or consequences if the Defendant engages in offensive speech. For instance, he could be ejected from a Board meeting if he is disruptive. Or he can be held to the directive notifying the Defendant that any check for common areas containing a notation such as those he had been writing would not be accepted. If the Defendant persists in including offensive comments on his common area checks, those checks will be rejected. Having been warned, he cannot complain if the Plaintiff takes appropriate action against him relating to nonpayment of common area fees.
The court has found that the Defendant’s conduct of posting signs in the Condominium trash area, of raising his middle finger when passing the security cameras or Mr. Ritzinger or Mr. DiMonte are not violations of the By-Laws or Rules and Regulations. The court has also found that the conduct of the Defendant vis-a-vis Ms. Young does not constitute a nuisance in violation of the By-Laws as to the Plaintiff.
However, the court does find that the Defendant’s conduct in leaving fans in the common areas, opening and closing doors in the common areas and leaving bags with dog feces at Mr. Ritzinger’s door violated Rule 3 of the Rules and Regulations governing common areas. His disruption of the Board meeting in March of 2008 was also a violation. All of this misconduct justified the issuance of warnings as done by counsel on several occasions. They do not justify granting injunctive relief.
Injunctive Relief
To justify issuance of permanent injunctive relief, the Plaintiff must demonstrate irreparable harm. See Shaw v. Harding, 306 Mass. 441, 449-50 (1940) (“One ... is not entitled to seek [injunctive] relief unless the apprehended danger is so near as at least to be reasonably imminent”); Old Colony Reg’l Vocational Technical High Sch. Dist. v. New England Constructors, Inc., 5 Mass.App.Ct. 836, 837 (1977) (holding injunction unnecessary where no evidence that conduct “had actually been attempted or was about to be made”).
The Plaintiffs requests to enjoin the Defendant from contacting Condominium staff, Condominium Board members, and the Association’s attorneys (except in writing), and from acting in an abusive, threatening, harassing, or offensive manner, are also problematic because they constitute illegal prior restraints. The evidence before the court is that the Defendant uttered profanities at a Board meeting; left a message on Mr. Ritzinger’s answering machine uttering profanities and calling him a Nazi; raised his middle finger at Mr. Ritzinger, Mr. DiMonte, and the Condominium security camera; and wrote insulting messages in the memo section of his monthly Condominium fee checks.[11] The court finds that this expressive conduct is protected under the First Amendment. The Plaintiff bears a heavy burden of justifying the court exercising its equitable powers to restrain protected expression.
Expressive conduct that constitutes fighting words may be regulated because it is not entitled to First Amendment protection. See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942); see also Gooding v. Wilson, 405 U.S. 518, 523 (1972). Fighting words are “those which by their very utterance . . . tend to incite an immediate breach of the peace.” Chaplinsky, 315 U.S. at 572; see also Cohen v. California, 403 U.S. 15, 20 (1971) (defining fighting words as “personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction”). However, “the use of epithets or otherwise profane language alone is not a basis for regulating speech as fighting words.” Nolan v. Krajcik, 384 F.Sup.2d 447, 459 (D.Mass. 2005); see also Commonwealth v. A Juvenile, 368 Mass. 580, 589 (1975) (noting state cannot criminally sanction “(v]ulgar, profane, offensive or abusive speech” alone under First Amendment).
The Defendant’s expressive conduct listed above does not constitute fighting words.
The use of profanities at the Board Meeting and the raising of his middle finger at the Condominium security camera are not fighting words because this conduct “was clearly not ‘directed to the person of the hearer.’ ” Cohen, 403 U.S. at 20, quoting Cantwell v. Connecticut, 310 U.S. 296, 309 (1940). Rather, the conduct was directed to the Board generally in response to its handling of several of the Defendant’s complaints. Additionally, the evidence reflects the fact that, while the Defendant’s tone was loud and aggressive at the Meeting, his interruption was brief and the Meeting was not suspended, indicating no one reacted violently to the Defendant’s words. See id. (noting lack of showing that any witness to plaintiffs expressive conduct “was in fact violently aroused”). The same holds true for the Defendant’s raising of his middle finger at Mr. Ritzinger and Mr. DiMonte; there is no evidence that Mr. Ritzinger or Mr. DiMonte reacted violently, or even reacted at all, to the Defendant’s conduct. See id.; see also Nolan, 384 F.Sup.2d at 460 (stating fact that no audience member approached plaintiff after he shouted “(c]ome on down and make me sit down — assholes” suggests plaintiffs conduct not “particularly provocative”).
The Defendant’s leaving of a profane and offensive message for Mr. Ritzinger and writing of insulting messages on his checks also cannot be classified as fighting words. The regulation of fighting words is meant to prevent the “type of personal, face-to-face, abusive and insulting language likely to provoke a violent retaliation^ i.e., ]self-help.” Gooding, 405 U.S. at 529-30 (Burger, C.J., dissenting) (emphasis added); see also A Juvenile, 368 Mass, at 591 (noting fighting words “must be ‘di *140 reeled to the person of the hearer’ in the sense that they are a face to face personal insult” (quoting Cantwell 310 U.S. at 309)). The Defendant’s messages and checks were clearly not face-to-face communications, and therefore had very little chance of provoking a violent reaction from Mr. Ritzinger and Mr. DiMonte. Indeed, when Mr. Ritzinger received the Defendant’s message that contained profanities and the word Nazi, he did not confront the Defendant, even though he found the message offensive. Instead, he called the Orleans Police and played the message for them. This action is further indication that the Defendant’s conduct did not constitute fighting words. See Cohen, 403 U.S. at 20; Nolan, 384 F.Sup.2d at 460.
The court rules that the First Amendment protects the Defendant’s expressive conduct in utilizing profanities (both spoken and in gestures), insults, and offensive words directed at the various entities described above. Accordingly, the court will not issue a permanent injunction barring the Defendant from such conduct, as requested by the Plaintiff in requests a), d), and e). Such an injunction would be an illegal prior restraint on the Defendant’s protected expressive conduct, as the Plaintiff has not asserted any compelling interest in limiting the Defendant’s conduct. See Care & Protection of Edith, 421 Mass. 703, 705 (1996); see also Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963) (“Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity”).[12]
The Plaintiff is therefore not entitled to any of the injunctive relief it requests from the court.
D. Count IV: Attorneys Fees
Pursuant to G.L.c. 183A, §6(a)(ii), the Plaintiff seeks its attorneys fees incurred in bringing this action to enforce the Condominium documents and to prosecute the Defendant’s alleged misconduct. As the court ruled above, however, the only misconduct the Defendant engaged in was resolved before the Plaintiff brought this action. Thus, the Plaintiff is not entitled to its attorneys fees under G.L.c. 183A, §6(a)(ii) except as to the fees incurred in issuing warnings to the Defendant of conduct the court has found to have been in violation of the Master Deed, By-Laws or Rules and Regulations.
ORDER
Based upon the foregoing, the court DECLARES in Count I the Defendant did violate certain provisions of the By-Laws and Rules and Regulations of the Condominium as set forth herein and with respect to Count II that the Defendant did not engage in common-law nuisance; with respect to Count III, the Plaintiff is not entitled to permanent injunctive relief; and the Plaintiff did incur expenses in issuing warnings to the Defendant with respect to the violations of the ByLaws and Rules and Regulations found herein.
Therefore, it is ORDERED that judgment shall enter for the Defendant on Counts II and III. It is further ORDERED that judgment shall enter for the Plaintiff on Counts I and IV. Within thirty (30) days, the Plaintiff shall file an affidavit of expenses incurred for issuing warnings as a result of the violations found herein.

 General Laws c. 183A, §6(a)(ii) provides: “If any expense is incurred by the organization of unit owners as a result of the unit owner’s failure to abide by the requirements of this chapter or the requirements of the master deed, tmst, bylaws, restrictions, rules or regulations, or by the misconduct of any unit owner, or his family members, tenants, orinvitees, the organization of unit owners may assess that expense exclusively against the unit owner and such assessment shall constitute a lien against that unit from the time the assessment is due, and such assessment shall be enforceable as a common expense assessment under this chapter . . . The organization of unit owners may also assess any fees, attorneys fees, charges, late charges, fines, costs of collection and enforcement, court costs, and interest charged pursuant to this chapter against the unit owner and such assessment shall constitute a lien against the unit from the time the assessment is due, and shall be enforceable as common expense assessments under this chapter.”

 In advancing the hearing on the application for injunctive relief with trial on the merits, the court expedited the case veiy significantly. The court commends both counsel for the time and effort they put into preparing for the trial and for their presentations at trial on such short notice.

 In 2009, the Master Deed was amended and restated by vote of seventy-five (75%) per cent of the unit owners. The votes of unit owners were dated as late as June of 2009. The Amended and Restated Master Deed was recorded on August 13, 2009 at Book 23961 at Page 47002, after the filing of this action.

 The Defendant’s version is that he went to see Ms. Young at her unit and offered to contribute $2,500.00 towards soundproofing to reduce the noise problem. Ms. Young does not recall such a conversation.

 Military time.

 The Restated Master Deed expressly authorizes the Board to conduct litigation on behalf of unit owners which is not included in the original Master Deed.

 The Plaintiff does not represent the individual interests of Ms. Young in this action. See Golub v. Milpo, Inc., 402 Mass. supra Thus, whatever claims or recourse Ms. Young may have against the Defendant is not at issue here and the court expressly declines to make any finding with respect to her individual claims (if any).

 Presumably this is the incident giving rise to the claims that the Defendant was abusive to counsel for the Plaintiff. Counsel at the March 2008 meeting was not trial counsel. He did not testify.

 Although practice imports a continuous course of conduct, there is no evidence that misconduct at Board meetings was an ongoing problem predating the March 2008 meeting.

 This contradicts the Plaintiffs assertion that issuing notices of violations were insufficient to abate the Defendant’s conduct.

 The court notes that the Defendant’s language would make a truck driver blush, without intending any insult to truck drivers.

 Having declined to issue an injunction, the Defendant should not construe the court’s decision as approving of the use of profanity in words and gesture. There is a more civilized manner in which issues can be discussed and resolved. The Defendant’s conduct and manner of expressing himself, albeit protected, are nonetheless offensive and unnecessary.